526 So.2d 1101 (1988)
Edwin P. BRANNAN
v.
WYETH LABORATORIES, INC. and American Home Products Corporation.
No. 87-C-2667.
Supreme Court of Louisiana.
May 23, 1988.
Rehearing Denied September 8, 1988.
Barbara Ryniker Evans, Kimberly Wooten, Partee, Waldrip, Mott, & Evans, New Orleans, for applicant.
William Reinhardt, Jr., Post, Reinhardt & Rougelot, William McGoey, Metairie, for respondents.
Charles R. Moore, Baton Rouge, James Wysocki, New Orleans, Louisiana Trial Lawyers Ass'n, Baton Rouge, Louis L. Robein, Jr., Magdalen C. Blessey, Gardner, Robein & Healey, Metairie, amicus curiae for Louisiana Trial Lawyers Ass'n.
*1102 Stephen D. Ridley, Andrew P. Burnside, McCalla, Thompson, Pyburn & Ridley, New Orleans, amicus curiae for Louisiana Ass'n of Business and Industry and the Chamber/New Orleans and the River Region.
DIXON, Chief Justice.
Edwin P. Brannan sued his former employer, Wyeth Laboratories, Inc. and American Home Products Corporation (AHPC), for breach of an employment contract, defamation and wrongful denial of stock option rights and dental benefits. A jury verdict was rendered in plaintiff's favor awarding plaintiff damages of $300,000 for breach of employment contract, $250,000 for defamation, $40,000 for the stock option rights and $350 for dental benefits. The court of appeal affirmed. Brannan v. Wyeth Laboratories, Inc. and American Home Products Corp., 516 So.2d 157 (La. App. 5th Cir.1987). We reverse in part and affirm in part.
Plaintiff began work with Wyeth and its parent corporation, AHPC, on September 1, 1964 as a pharmaceutical salesman or detailman, and eighteen years later, on October 8, 1982, he was terminated for falsifying doctor call reports. Plaintiff had previously been employed at the Louisiana State University Medical School as a research chemist, where he was a civil service employee. Plaintiff testified that he was concerned about job security when he was considering employment with Wyeth. He said the two people who interviewed him at Wyeth, Division Manager Bernard Kaiser and District Manager Frank Messina, made it clear to him that he was applying and being interviewed for a permanent position, and he would be able to keep the job as long as he performed. Plaintiff says it was also stated that Wyeth had a policy not to terminate without reasonable, just cause. Also if there was some problem with his employment, it would be pointed out, and if it was serious, he would be put on probation and given an appropriate length of time in which to correct it. If it was not corrected, then termination was a possibility. These are the conditions under which plaintiff says he accepted the position at Wyeth.
These assurances along with a number of documents signed subsequent to his employment are what plaintiff relies on in his contention that he had an oral employment contract for a definite termuntil he reached retirement age at sixty-five. Plaintiff submitted documents to support this alleged contract. Most of these documents are standard forms which refer to the employee reaching the normal retirement age of sixty-five, or refer to plaintiff's expected date of retirement, October 1, 2004. These documents include: (1) an Aetna Life Insurance policy; (2) three documents captioned "Your Personal and Confidential Report of Employee Benefits for" 1970, 1971, and 1972; (3) a letter dated August 7, 1972 from H.W. Blades, Chairman of Wyeth, and signed also by Charles Kerns, President of Wyeth, outlining the improvement in the retirement plan; (4) internal correspondence from J.F. Johnson, Vice President of Industrial Relations of Wyeth; and (5) a Retirement Plan booklet and letter from John Culligan, President of AHPC, and Lowell F. Johnson, Vice President. Plaintiff also submitted an agreement dealing with the proper handling of samples which states that violation of this policy is just cause for dismissal, and an employment agreement dated June 20, 1974 in which the employee agrees not to engage in other similar work, not to disclose company secrets, and agreeing that anything developed, discovered or patented by the employee will be turned over to Wyeth. Finally, plaintiff submitted a Territory Managers Manual, dated June 4, 1979, in which § 301 refers to performance appraisal and indicates that if an employee's performance is not up to the required standard, he can be put on a performance improvement program. If performance does not improve, the employee can be put on probation.
Plaintiff was placed on a performance improvement program in September, 1979 in order to increase his number of daily doctor calls and because he was not following the plan promotion program. According to plaintiff's supervisor, Frank Messina, *1103 the expected number of calls was seven calls per day. Before September, 1979 plaintiff was making an average of just over six calls a day, and his average did not change during or after the performance improvement program in January, 1980.
Plaintiff received raises each year he was employed with Wyeth, although, according to Messina, they were tied into his sales, and were not the highest raises given. Plaintiff also showed an increase in sales over the years of his employment which Messina said was partially due to new products and increased prices. Plaintiff's territory included East Jefferson Parish, which was the fastest growing parish in Louisiana.
In 1982 Messina received calls from Dr. Thomas Dunn and Marlene Armbruster, a Registered Nurse who worked for Dr. Andrew Rinker, complaining about attempts to place orders with or get in touch with plaintiff. Dr. Dunn testified that in the spring of 1982 he wanted to place an order for a Wyeth First Aid Kit for his church. Dr. Dunn notified his receptionist that he wanted to see the Wyeth representative on his next visit. At about three week intervals Dr. Dunn would receive reminders from the church about the first aid kit, and Dr. Dunn felt embarrassed when he was reminded for the third time. At that point he had his office pharmacist call Wyeth. A few days later Messina came to take the order. Plaintiff's call reports indicated that he had called on Dr. Dunn five times from January, 1982 to August, 1982. Dr. Dunn testified that he would be surprised if it were that many times.
Armbruster testified that she had problems placing orders with Wyeth and asked plaintiff to call every two or three weeks to avoid hassles with ordering drugs for Dr. Rinker's office. She testified that she called plaintiff at home at night to place orders or leave messages on his answering machine. Despite her requests, plaintiff did not make calls every two or three weeks. She testified that her problems with placing orders with plaintiff went back a number of years. She called Messina to complain about her attempts to get in touch with plaintiff. Armbruster prepared a drug survey for several years to show how much business her office did with Wyeth and to show that they needed service.
The complaint from Dr. Rinker's office precipitated an investigation by Messina at the direction of James French, a division manager for Wyeth. Messina conducted a two day surveillance of plaintiff and also visited a number of doctors plaintiff had reported having visited. This investigation brought about plaintiff's termination on October 8, 1982 for falsifying "doctor call" reports. French and Messina testified that plaintiff admitted not having called on Drs. Sterling Dunn, Sara Lain, Jefferson Steele and Ronald Martz on September 16, 1982 and Dr. Dabney Ewin on September 17, 1982, although his call reports indicated he had made these calls. In his testimony, plaintiff denied having admitted he did not make these calls. Plaintiff was given the option of resigning, but he refused.

BREACH OF EMPLOYMENT CONTRACT
Several articles of the Louisiana Civil Code are pertinent to this issue:
"Persons who have attained the age of majority cannot bind themselves for a longer term than ten years." C.C. art. 167.
"A man can only hire out his services for a certain limited time, or for the performance of a certain enterprise." C.C. art. 2746.
"A man is at liberty to dismiss a hired servant attached to his person or family, without assigning any reason for so doing. The servant is also free to depart without assigning any cause." C.C. art. 2747.
"A contract of unspecified duration may be terminated at the will of either party by giving notice, reasonable in time and form, to the other party." C.C. art. 2024.
There is a consistent line of jurisprudence in this state holding that an employment contract for life or for an indefinite term is terminable at the will of either party. Pechon v. National Corporation *1104 Service, Inc., 234 La. 397, 100 So.2d 213 (1958); United Credit Co., Inc. v. Croswell Co., Inc., 219 La. 993, 54 So.2d 425 (1951); Page v. New Orleans Public Service Inc., 184 La. 617, 167 So. 99 (1936); Jackson v. The East Baton Rouge Parish Indigent Defender's Board, 353 So.2d 344 (La.App. 1st Cir.1977), writ denied, 354 So.2d 1385 (La.1978). Also a contract for longer than the time provided in art. 167, which is presently ten years, is void. Hill v. Missouri Pacific Ry., 8 F.Supp. 80 (W.D.La.1934); Lowther v. Fireside Mutual Life Insurance Co., 228 La. 946, 84 So.2d 596 (1955). In Pitcher v. United Oil & Gas Syndicate, 174 La. 66, 139 So. 760, 761 (1932), this court held that a contract for employment as long as the employer-master is operating is a contract for an indefinite period, and without other consideration from the employee-servant than services to be rendered, the contract is terminable at the will of either party. In Pitcher the court elaborated on the reasons behind this law:
"... An employee is never presumed to engage his services permanently, thereby cutting himself off from all chances of improving his condition; indeed, in this land of opportunity it would be against public policy and the spirit of our institutions that any man should thus handicap himself; and the law will presume almost juris et de jure that he did not so intend. And if the contract of employment be not binding on the employee for the whole term of such employment, then it cannot be binding upon the employer; there would be lack of `mutuality.' But if the employee has given, in addition to the services which he promised to perform, a consideration, whatever the nature of such consideration be, then he has in effect purchased, for a valuable consideration, an option to keep the employment for the term specified; and such a contract is a valid one."
The present case involves a situation in which, even if the relationship between the parties could be construed as constituting an oral contract of employment, the ten year term provided for in art. 167 has run, and the contract is terminable at will. Plaintiff had been employed by defendant for eighteen years at the time of his termination; leaving a civil service job to take a higher paying job is not "consideration" as required in Pitcher.
In addition, defendant established just cause for termination under the circumstances of this case. Despite plaintiff's denial of the allegations of falsifying doctor call reports, there was considerable testimony by independent witnesses confirming that there had been complaints about plaintiff not calling them regularly. These witnesses testified that they had run out of Wyeth products which they used on a regular basis and had not seen plaintiff over a long period of time. One doctor, Dr. Lain, and her assistant, Iris Givvens, testified that in their office, they used almost exclusively a type of Wyeth birth control tablet, but they had difficulty getting the product because the Wyeth representative did not come regularly. Ms. Givvens began work for Dr. Lain in July, 1982 and testified that she had never seen or met plaintiff in the entire time she was there from July until he was terminated in October, 1982. Dr. Lain herself testified that she had regular appointments with detailment and yet did not even recognize or remember plaintiff when she met him at the deposition in preparation for this trial.
Mr. French testified that the pharmaceutical business is a very competitive business in which Wyeth could not afford to have dissatisfied customers who are not visited regularly and supplied with the products they need.
There was also testimony by Gary Theriot, now an employee of Wyeth, who was working for Boots Pharmaceuticals in the summer of 1982 when he met plaintiff at Lakeside Hospital. Theriot introduced himself to plaintiff in the waiting room, and plaintiff began telling Theriot about being "leaned on" to make more calls. Plaintiff told Theriot he had been with the company nineteen years and could not be fired. Plaintiff also talked about Messina in derogatory terms. In addition, plaintiff himself admitted at trial that he was not making the required number of calls per week *1105 and had not improved, even though he had been placed on a performance improvement program earlier in his employment.
Plaintiff was specifically hired to call on doctors in order to sell Wyeth pharmaceutical products. The evidence shows that he failed to make adequate numbers of calls, falsified call reports in order to meet the company requirements, and was not adequately supplying Wyeth products to regular customers. In light of this evidence, even if there had been a contract which could have run until plaintiff's retirement, the defendant had just cause to terminate plaintiff's employment.

DEFAMATION
Plaintiff's supplemental petition raises the defamation claim as regards statements made by Wyeth employees, Gary Theriot and Ronald Gros, to employees of Charity Hospital in New Orleans and Steward Pharmaceutical Company. Plaintiff alleges that the Wyeth employees defamed him by saying that he was "terminated for arriving late at work, leaving work early and falsifying company records." Plaintiff alleges that all such statements are false, were made without substantiation and with malice and resulted in damages to plaintiff's reputation.
Although it was not raised in plaintiff's petition, the court of appeal considered plaintiff's contention that he was also defamed by Messina and French when they told several doctors that plaintiff was fired for falsifying company records. The court of appeal found that the statements made to the doctors did not all occur during the investigation of plaintiff or in preparation for trial and therefore were not subject to a privilege. The court of appeal found that the words involved in this case were defamatory per se.
We do not find that the trial testimony substantiates plaintiff's allegations. There was ample evidence from which to conclude that the statements actually made were true, and therefore not defamatory.
According to plaintiff's version of the events, he was told by Mike Szczepanski, an employee of Syntex Laboratories, that Gary Theriot said in the presence of him and others at Charity Hospital that plaintiff was fired for falsifying company records, not working and not doing his job. Plaintiff alleged also that he was also told that Ron Gros told employees of Steward Pharmaceutical Company that plaintiff was fired for falsifying company records and other improprieties.
The testimony of five of the witnesses to these events does not substantiate that the words "fired for falsifying company records" was ever used by anyone. "For failure to follow company policy" and "fired because he wasn't working" were the words used by these witnesses.
It is only in the testimony of two of the doctors, Dr. Dunn and Dr. Lain, that there is substantiation that the words "terminated for falsifying company records" were used. On cross-examination, plaintiff's counsel asked Drs. Dunn and Lain if they were told by Messina and French that plaintiff was terminated for falsifying company records. The doctors answered affirmatively.
There was also testimony that plaintiff himself told several people that he was fired.
In order to maintain an action in defamation, the plaintiff must prove the following elements: (1) defamatory words, (2) publication, (3) falsity, (4) malice, actual or implied, and (5) resulting injury. Cangelosi v. Schwegmann Brothers Giant Super Markets, 390 So.2d 196 (La.1980). Manale v. City of New Orleans, Department of Police, 673 F.2d 122 (5th Cir.1982); Makofsky v. Cunningham, 576 F.2d 1223 (5th Cir.1978); "Defamation: A Compendium," 28 La.L.Rev. 82 (1967). Proof of the truth of a defamatory remark is a valid defense in a civil suit for defamation. R.S. 13:3602; Deshotel v. Thistlethwaite, 240 La. 12, 121 So.2d 222 (1960); Pool v. Gaudin, 209 La. 218, 24 So.2d 383 (1946).
As discussed previously in the breach of contract issue, the doctors and their assistants testified that they ran out of Wyeth products, were forced on occasion to buy from pharmacies in order to get Wyeth *1106 products, had problems contacting plaintiff, and had requested more frequent service from plaintiff which was not forthcoming without finally resorting to calling Wyeth supervisory personnel. At least two of the witnesses, Dr. Lain and her assistant, did not even remember ever having met plaintiff. These are people plaintiff reported to Wyeth to be among those he called. This testimony not only furnished just cause for plaintiff's termination, but also establishes the truth of statements for which plaintiff claims damages.

STOCK OPTION AND DENTAL BENEFITS
Wyeth's stock option plan provides that terminated employees are entitled to exercise the option within ninety days of termination. However, the exercise of the option is not permitted if the employee is fired for "gross misconduct" or if the employee voluntarily resigns.
Although plaintiff had the option to buy three hundred ninety shares of Wyeth stock, he only attempted to buy ten shares after his termination. Defendant did not allow plaintiff to purchase the stock, contending that he was not entitled to exercise the option because he was fired for "gross misconduct."
In State v. O'Hara, 252 La. 540, 211 So.2d 641, 648 (1968), we defined "gross misconduct" where the issue was removal of a judge from office:
"`Misconduct', in general, is improper conduct or wrong behavior, but as used in speech and in law it implies that the conduct complained of was willed and intentional. It is more than that conduct which comes about by reason of error of judgment or lack of diligence. It involves intentional wrongdoing or total lack of concern for one's conduct. Whether or not an act constitutes misconduct must be determined from the facts surrounding the act, the nature of the act, and the intention of the actor. `Gross' is generally defined as `flagrant' and `extreme'."
Judge O'Hara's conduct was not found to rise to the level of gross misconduct although he had a "very intimate and personal relationship" with a contractor, Zachary A. Strate, who was convicted in an Illinois federal court of mail and wire fraud and conspiring to defraud. The court found that O'Hara associated with Strate knowing he had been convicted in a federal district court of a felony; that he used his title of judge and the prestige of his office in an attempt to obtain evidence in order to set aside a conviction in a federal court, and that he accepted gifts and gratuities from Strate. Although O'Hara was found guilty of misconduct, the court did not find him guilty of that flagrant and extreme misconduct which would constitute "gross misconduct" and which would warrant his removal.
We find the same thing to be true in this case. Although plaintiff's actions amounted to misconduct and justified the termination of his employment, we do not find his conduct amounted to "gross misconduct" such that he should be denied the stock option rights which he sought to exercise.
Plaintiff, a drug salesman, was guilty of falsifying company records in order to meet his quota of doctor calls per week. He said he was doing work which he was not doing. Considering his entire performance as disclosed by the record of this case, this conduct does not amount to "gross misconduct."
However, plaintiff is only entitled to the ten shares of stock he sought to purchase within the ninety days of his termination. The record supports an award of $491.20, the difference between the $27.75 option price per share and $76.87 market price per share on the day of the trial.
Plaintiff also claims that Wyeth refused to pay $350 of dental benefits which were owed him under a dental benefits insurance policy.
In a suit for damages, it is plaintiff's burden to prove the damages he suffered as a result of defendant's fault, and to support the award, there must be evidence in the record. Borden, Inc. v. Howard Trucking Co., Inc. 454 So.2d 1081 (La. *1107 1983); McCandless v. Southern Bell Telephone & Telegraph Co., 239 La. 983, 120 So.2d 501 (1960); Jeanfreau v. Sanderson, 239 La. 51, 117 So.2d 907 (1960); Andrus v. White, 236 La. 28, 106 So.2d 705 (1959); Tadin v. New Orleans Public Service Inc., 226 La. 629, 76 So.2d 910 (1955).
From a careful review of the exhibits, it appears that the only claim which plaintiff proved was not paid was the $50 claim for his son Daniel.
For the foregoing reasons, the judgments of the courts below are reversed in part and affirmed in part. The judgments as to the breach of employment contract and the claim of defamation are reversed and there is now judgment in favor of defendants, Wyeth Laboratories, Inc. and American Home Products Corporation, and against plaintiff, Edwin P. Brannan, on those two claims; the judgment for the breach of the stock option plan is reduced to $491.20, and the judgment for dental benefits is reduced to $50.00, both with legal interest from date of demand until paid, all at the cost of the defendants.