739 So.2d 911 (1999)
Byron ARANYOSI, et al.
v.
DELCHAMPS, INC., et al.
No. 98 CA 1325.
Court of Appeal of Louisiana, First Circuit.
June 25, 1999.
*913 Henry G. Terhoeve, Baton Rouge, LA, for plaintiffs/appellants Byron Aranyosi, et al.
Walter W. Christy, Leslie W. Ehret, New Orleans, LA, for defendants/appellees Delchamps, Inc. and Kenneth Easton.
BEFORE: CARTER, C.J., SHORTESS and WHIPPLE, JJ.
WHIPPLE, J.
This appeal arose following the granting of a partial summary judgment in favor of an employer dismissing the claims of former employees for defamation, defamation conspiracy and invasion of privacy.

FACTS AND PROCEDURAL HISTORY
In October of 1996, plaintiffs/appellants, Byron David Aranyosi,[1] Greg Clayton, David Tippitt, Joey Lamonte, Arthur Strahan, Cody Fitzgerald, Joe Hanson, Donnie H. Lester, John R. Tate, Donald Lee, Michael B. Ledford, Ronald Richardson, and Marvin Jones ("Plaintiffs"), were employed by defendant, Delchamps, Inc. ("Delchamps"), at its warehouse or "ice house" facility in Hammond, Louisiana. On October 4, 1996, plaintiffs were called into the office of Kenneth Easton, a Delchamps official, in small groups and were informed that their employment had been terminated. Plaintiffs were told that their jobs associated with an ice manufacturing process were to be replaced by outside procurement and/or contract maintenance. Plaintiffs were provided with information concerning payroll, unemployment, accrued vacation time and other benefits, allowed to retrieve their personal belongings and escorted to their vehicles.
Later that day, Michael Bryan, while on duty as a security guard at the Delchamps facility, was the victim of aggravated battery and received a bomb threat from the perpetrators.[2] During the investigation of the incident, Kenneth Easton, "Jimmy" Giddeon and/or other Delchamps employees revealed to police officers that during the exit interview process, several of the employees had become agitated and made comments, such as: "What goes around, comes around"; "You will reap what you sow"; "Yall" [sic] better watch your backs"; and, "I will make sure the same thing happens to you ... and your family...." One employee was even quoted as saying that "he received a vision about the warehouse blowing up ." The Hammond Daily Star reported the incident on October 8, 1996, as follows:
Hammond police are searching for two men who put a gun to a Delchamps security guard's head and told him there was a bomb in the warehouse before fleeing Friday night.
The incident happened only hours after store officials laid off about 14 long-time employees.
Michael Bryan was checking the outside fence at the Delchamps warehouse on Pride Drive when he saw two men on the fence about 9 p.m., said Sgt. Jay Callais, police spokesman. The men appeared to be climbing out of the fenced area.
Bryan yelled for the two men to stop and rode up to them in a golf-cart type security vehicle. The two white suspects were dressed in camouflage clothing with masks over their faces and gloves on their hands.
One of the men pointed a black revolver at Bryan's head and told him to *914 tell the general manager, Kenny Eastman [sic], that they knew where he lived and were going to get him[,] Callais said. The men also told Bryan there was a bomb in the warehouse.
Before the two suspects left, the hit Bryan in the head with the butt of the handgun.
Hammond Fire Department was called and aided the police department and the employees in a search of the building. No bomb was found.
The man with the handgun is described as being about 6-feet tall and having a heavy build. He was also missing a front tooth[,] Callais said.
Company officials said they had been threatened earlier that day by several of the 14 employees who officials laid off. Some of the workers had been with the company for almost 12 years.
On December 20, 1996, plaintiffs filed the instant lawsuit against Delchamps, Kenneth Easton, and James N. Giddeon, III,[3] seeking damages for wrongful termination, breach of contract, retaliatory discharge, intentional infliction of emotional distress, defamation, defamation conspiracy and invasion of privacy.[4] Plaintiffs allege that defendants acted in concert to defame them and place them in a false light before the public by informing police and the local newspaper that plaintiffs had threatened defendants and were involved in the commission of a crime. On January 12, 1998, defendants filed a motion for partial summary judgment "on the defamation, defamation conspiracy and invasion of privacy claims against them." The motion for summary judgment was granted and the claims for defamation, defamation conspiracy and invasion of privacy were dismissed.[5] Plaintiffs appeal, contending that the trial court erred in granting defendants' motion for summary judgment.

MOTION FOR SUMMARY JUDGMENT
A motion for summary judgment is a procedural device used to avoid a full-scale trial where there is no genuine factual dispute. Sanders v. Ashland Oil, Inc., 96-1751, p. 5 (La.App. 1st Cir.6/20/97); 696 So.2d 1031, 1034, writ denied, 97-1911 (La.10/31/97); 703 So.2d 29. It should be granted only if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966.
Previously, the jurisprudence had held that summary judgments were not favored and were to be used cautiously and sparingly. Any doubt was to be resolved against granting the motion and in favor of a trial on the merits. However, in 1996, the legislature amended LSA-C.C.P. art. 966 to overrule the presumption in favor of trial on the merits. Summary judgments are now favored, and the documents submitted by both parties are to be equally scrutinized. Berzas v. OXY USA, Inc., 29,835, pp. 4-5 (La.App. 2nd Cir.9/24/97); 699 So.2d 1149, 1152; Hayes v. Autin, 96-287, p. 6 (La.App. 3rd Cir.12/26/96); 685 So.2d 691, 694, writ denied, 97-0281 (La.3/14/97); 690 So.2d 41.
In 1997, by Act No. 483, the legislature again amended LSA-C.C.P. art. 966 to incorporate the federal summary judgment analysis. The 1997 amendment to LSA-C.C.P. art. 966 applies retroactively and is to be utilized by this court in assessing summary judgments granted prior to the *915 effective date of the amendment. Morgan v. Earnest Corp., 97-0869, p. 7 (La.App. 1st Cir.11/7/97); 704 So.2d 272, 276, writ denied, 97-3031 (La.2/20/98); 709 So.2d 775. Under the amended version of LSA-C.C.P. art. 966, the initial burden continues to remain with the mover to show that no genuine issue of material fact exists. If the moving party points out that there is an absence of factual support for one or more elements essential to the adverse party's claim, action or defense, the nonmoving party then must produce factual support sufficient to satisfy his evidentiary burden at trial. LSA-C.C.P. art. 966(C)(2). If the nonmoving party fails to do so, there is no genuine issue of material fact, and summary judgment should be granted. LSA-C.C.P. arts. 966 and 967; Berzas, 29,835 at p. 8; 699 So.2d at 1154.
Appellate courts review summary judgments de novo under the same criteria that govern the trial court's determination of whether a summary judgment is appropriate. Sanders, 96-1751 at p. 7; 696 So.2d at 1035. Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to this case. Walker v. Phi Beta Sigma Fraternity (RHO Chapter), 96-2345, p. 6 (La.App. 1st Cir.12/29/97); 706 So.2d 525, 528.

Defamation, Defamation Conspiracy and Invasion of Privacy
In order to maintain an action in defamation, the plaintiff must prove the following elements: (1) defamatory words; (2) publication; (3) falsity; (4) malice; actual or implied; and (5) resulting injury. Brannan v. Wyeth Laboratories, Inc., 526 So.2d 1101, 1105 (La.1988); Cangelosi v. Schwegmann Brothers Giant Super Markets, 390 So.2d 196, 198 (La.1980). Statements are defamatory only if the words, taken in context, tend to injure the person's reputation, to expose the person to public ridicule, to deter others from associating or dealing with the person, or to deprive the person of public confidence in his or her occupation. Davis v. Borskey, 94-2399, p. 7 (La.9/5/95); 660 So.2d 17, 22; Sassone v. Elder, 626 So.2d 345, 352 (La. 1993). The question for the court in determining whether words have a defamatory meaning is whether a third person hearing the communication would have reasonably understood the communication, taken in context, as intended in a defamatory sense. Davis, 94-2399 at p. 8; 660 So.2d at 22; Sassone, 626 So.2d at 352. In Louisiana, accusation of a crime is considered defamatory per se. Cangelosi, 390 So.2d at 198; Davis v. Borskey, 92-2339, p. 5 (La.App. 1st Cir.8/22/94); 643 So.2d 179, 183, affirmed, 94-2399 (La.9/5/95); 660 So.2d 17; Redmond v. McCool, 582 So.2d 262, 265 (La.App. 1st Cir.1991). Generally, defamation per se creates a presumption of falsity and malice which the defendant bears the burden of rebutting. Davis, 92-2339 at p. 6; 643 So.2d at 183; Redmond, 582 So.2d at 265.
Proof of the truth of a defamatory remark is a valid defense in a civil suit for defamation. LSA-R.S. 13:3602;[6]Brannan, 526 So.2d at 1105. Privilege is also a defense to a defamation action. Redmond, 582 So.2d at 264; Elmer v. Coplin, 485 So.2d 171, 176 (La.App. 2nd Cir.), writ denied, 489 So.2d 246 (La.1986). Privileged communications are divided into two general classes: (1) absolute or unqualified; and (2) conditional or qualified. Elmer, 485 So.2d at 176. An absolute privilege exists in a limited number of situations, such as certain statements by judges and legislators in their official capacities. Id. In a broader number of instances, statements enjoy a conditional *916 privilege. Id. Toomer v. Breaux, 146 So.2d 723, 725 (La.App. 3rd Cir.1962). The essential elements of a conditional privilege are "good faith, an interest to be upheld and a statement limited in scope to this purpose, a proper occasion, and publication in the proper manner and to proper parties only." Elmer, 485 So.2d at 176, quoting Madison v. Bolton, 234 La. 997, 102 So.2d 433 (1958). A conditional privilege is applicable if the communication is made (a) in good faith,[7] (b) on any subject matter in which the person communicating has an interest or in reference to which he has a duty, (c) to a person having a corresponding interest or duty. Id.
This privilege arises from the social necessity of permitting full and unrestricted communication concerning a matter in which the parties have an interest or duty, without inhibiting free communication in such instances by the fear that the communicating party will be held liable in damages if the good faith communication later turns out to be inaccurate." Id. quoting Toomer, 146 So.2d at 725. The public has an interest in possible criminal activity being brought to the attention of the proper authorities, and remarks made in good faith setting forth well-founded charges are clearly privileged. Jones v. Wesley, 424 So.2d 1109, 1111 (La.App. 1st Cir. 1982). Such a privilege extends to protect from liability for defamation an employer investigating suspected wrongdoing even though third persons become aware of the investigation and the subsequent discharge of an employee. Wright v. Dollar General Corp., 602 So.2d 772, 775 (La.App. 2nd Cir.), writ denied, 606 So.2d 538 (La.1992); Thibodeaux v. Southwest Louisiana Hospital Association, 488 So.2d 743, 747 (La. App. 3rd Cir.1986). Thus, any statement made by an employer to law enforcement officials in the course of an investigation of criminal activity is privileged and provides no basis for a defamation suit, even assuming the accuracy of a plaintiffs allegations. Wright, 602 So.2d at 775.
At the outset, we note that no evidence was introduced to controvert the truthfulness of any statements made by defendants. Nevertheless, even if all the elements of defamation were present, a qualified privilege exists in favor of defendants. The evidence presented herein on motion for summary judgment reveals that the only statements made by defendants were to the police officers investigating the aggravated battery and bomb threats against Delchamps and its employees on October 4, 1996. Plaintiffs presented no evidence to contradict this fact or to show that any statements were made by defendants to the Hammond Daily Star.[8] In contrast, Delchamps, in its LSA-C.C.P. art. 1442 deposition, denied making any statements to the newspaper and denied knowledge of any Delchamps employee doing so. While the newspaper article recited that "[c]ompany officials said ...," no affidavit from the reporter or any other evidence was introduced to rebut defendants' testimony or to establish that defendants were indeed the source of the statement. Instead, the reporter could have obtained these statements from the police spokesman rather than the company officials themselves. In fact, the article refers to its source, "Sgt. Jay Callais, police spokesman," three times.
Because defendants' statements were made to police officers in the course of a police investigation, they enjoy a qualified privilege. All the requirements for the application of the qualified privilege to defendants' statements have been met: defendants had a reasonable belief that the statements were true; defendants had a duty to report the statements to police *917 officers who inquired as to whether any unusual events had transpired on the day of the criminal activity; and obviously, the police had a corresponding duty to investigate any individuals who might have a motive to inflict harm on defendants. Plaintiffs argue that defendants informed third parties that they committed a crime. However, the evidence of record shows only that defendants reported the comments made by plaintiffs as they were fired from their jobs. There is no evidence in the record that defendants stated to anyone that plaintiffs were responsible for the aggravated burglary and/or bomb threat.[9] Plaintiffs' comments on the day of the criminal activity could easily be construed as threatening in nature and were reasonably disclosed during the police investigation of the violent actions directed toward Delchamps. Testimony by certain plaintiffs appearing in the record confirms the nature of the parting remarks made by some of the plaintiffs to defendants: "[H]ard times [are] ahead for Delchamps"; "[W]hat goes around, comes around"; "I'll be a thorn in your side"; "[H]e ought to reap what he sowed"; and "[Y]ou're fixing to find yourself drowning and ain't going to have nobody on the bank to give you no lifejacket." While only some of the plaintiffs made remarks such as these, defendants' statements accurately reflected this fact.
Accordingly, after a thorough review of the record, we find no issue of material fact remained with regard to plaintiffs' claim of defamation; therefore, defendants were entitled to judgment as a matter of law and summary judgment was properly granted on this issue.
Likewise, defendants were entitled to summary judgment on the defamation conspiracy claim. Since defendants are innocent of the claims of defamation, there can be no defamation conspiracy. Louisiana Civil Code article 2324 does not by itself impose liability for a civil conspiracy.[10]Butz v. Lynch, 97-2166, p. 6 (La.App. 1st Cir.4/8/98); 710 So.2d 1171, 1174, writ denied, 98-1247 (La.6/19/98); 721 So.2d 473. The actionable element in a claim under this article is not the conspiracy itself, but rather the tort which the conspirators agree to perpetrate and which they actually commit in whole or in part. In order to recover under this theory of liability, a plaintiff must prove that an agreement existed to commit an illegal or tortious act which resulted in the plaintiffs injury. Butz, 97-2166 at p. 6; 710 So.2d at 1174, Silver v. Nelson, 610 F.Supp. 505, 516-517 (E.D.La.1985). Hence, we agree with defendants that because plaintiffs cannot establish a defamation claim, they cannot show that defendants were involved in a conspiracy to defame. Thus, summary judgment was properly granted on this basis.
Finally, we turn to plaintiffs' claim of invasion of privacy. A succinct summary *918 of the action for invasion of privacy can be found in Tonubbee v. River Parishes Guide, 97-440, pp. 7-8 (La.App. 5th Cir.10/28/97); 702 So.2d 971, 975, writ denied, 97-3012 (La.2/13/98); 709 So.2d 747, cert. denied, ___ U.S. ___, 119 S.Ct. 142, 142 L.Ed.2d 115 (1998), wherein it is stated:
Courts have allowed tort actions for invasion of privacy which involves the basic right of a person to be let alone in his private affairs. An unwarranted invasion of a person's right of privacy may give rise to liability for the resulting harm. One type of invasion of privacy consists of publicity which unreasonably places the plaintiff in a false light before the public.
Even where a right to privacy is found to exist, Louisiana courts have distinguished between invasions of that right which are actionable and those which are non-actionable. An actionable invasion of privacy occurs only when the defendant's conduct is unreasonable and seriously interferes with the plaintiff's privacy interest. For an invasion to be actionable, it is not necessary that there be malicious intent on the part of the defendant. The reasonableness of the defendant's conduct is determined by balancing the conflicting interests at stake; the plaintiffs interest in protecting his privacy interest from serious invasions, and the defendant's interest in pursuing his course of conduct. The right of privacy is also limited by society's right to be informed about legitimate subjects of public interests. (Citations omitted).
After careful review, and considering these precepts, we find defendants' motion for summary judgment was properly granted. On the record before us, there is nothing to show defendants acted unreasonably in reporting activities occurring on the Delchamps premises on the day of the aggravated battery and bomb threat.
Accordingly, summary judgment was properly granted on this basis also.

CONCLUSION
For the reasons assigned herein, we affirm the March 13, 1998 judgment granting defendants' motion for summary judgment and dismissing plaintiffs' claims for defamation, defamation conspiracy and invasion of privacy. All costs of this appeal are assessed against plaintiffs/appellants.
AFFIRMED.
NOTES
[1] Mr. Aranyosi's name was misspelled "Aranyos" in the original petition and appears throughout the record with these variations and additionally as "Aranosi."
[2] No bomb was ever found.
[3] Mr. Giddeon was added as a defendant by plaintiffs' first supplemental and amending petition filed on May 6, 1997.
[4] Although the matter was removed to federal court on January 9, 1997, it was remanded back to state district court on April 23, 1997.
[5] The judgment was designated as a final judgment by the trial court in accordance with LSA-C.C.P. art. 1915.
[6] Louisiana Revised Statutes 13:3602 provides, "Whenever any civil suit for slander, defamation, or for a libel, shall be instituted in any court of this state, it shall be lawful for the defendant to plead in justification the truth of the slanderous, defamatory or libelous words or matter, for the uttering or publishing of which he may be sued; and in the trial of the issue in such suit, to maintain and prove his plea by all legal evidence."
[7] "Good faith" means a statement made with reasonable grounds for believing it to be true. Redmond, 582 So.2d at 264; Ward v. Sears, Roebuck & Company, 339 So.2d 1255, 1261 (La.App. 1st Cir.1976).
[8] Plaintiffs' answers to interrogatories, filed into the record, indicate they have no evidence to establish that defendants made statements to the newspaper.
[9] We note that the fax cover sheet accompanying the handwritten notes of employee remarks transmitted from Kenneth Easton to the police department states, "Statements made by the 14 men let go on 10-4-96 plus some comments made by still employed associates."
[10] Louisiana Civil Code article 2324 provides:

A. He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.
B. If liability is not solidary pursuant to Paragraph A, then liability for damages caused by two or more persons shall be a joint and divisible obligation. A joint tortfeasor shall not be liable for more than his degree of fault and shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss, regardless of such other person's insolvency, ability to pay, degree of fault, immunity by statute or otherwise, including but not limited to immunity as provided in R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable.
C. Interruption of prescription against one joint tortfeasor is effective against all joint tortfeasors.