# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## CA 04-715


**CHARLES M. ATWOOD AND GEORGE W. GONDRON**

**VERSUS**

**GRAND CASINOS OF LOUISIANA, INC., ET AL.**


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. C-97-756
HONORABLE JOHN P. NAVARRE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*


## JOHN D. SAUNDERS
## JUDGE

\*\*\*\*\*\*\*\*\*\*


Court composed of Sylvia R. Cooks, John D. Saunders, and Oswald A. Decuir, Judges.


**REVERSED AND REMANDED.**

Charles J. Foret
Briney & Foret
P. O. Drawer 51367
Lafayette, LA 70505
(337) 237-4070
Counsel for: Defendant/Appellee
Grand Casinos of Louisiana, Inc.

Michael R. Mangham
MANGHAM & HARDY
406 Audubon Blvd., #A
Lafayette, LA 70503
(337) 233-6200
Counsel for: Plaintiff/Appellant
Charles M. Atwood

**Sylvia M. Fordice**
**AAG**
**556 Jefferson St., 4th Fl**
**Lafayette, La 70501**
**(337) 262-1700**
**Counsel for: Defendant/Appellee**
**State of Louisiana, Dept of Public Safety & Corrections**

**Michael Edward Parker**
**Allen & Gooch**
**P. O. Drawer 3768**
**Lafayette, LA 70502-3768**
**(337) 291-1350**
**Counsel for: Defendant/Appellee**
**Zurich Insurance Co.**

**George W. Gondron**
**P. O. Box 265**
**Nederland, TX 77627**
**(409) 727-1488**
**Counsel for: Plaintiff/Appellee**
**George W. Gondron**

**SAUNDERS, J.**

Plaintiff, Charles Atwood, is appealing the trial court's grant of summary judgment in favor of the defendants. After careful consideration of the facts, we reverse the trial court's decision and remand the case.

**FACTS**

The plaintiff, Mr. Atwood, became employed with the Coushatta Tribe of Louisiana's casino in Kinder, Louisiana, as a black jack dealer in May 1994. Grand Casino is the managing company for the Tribe and they oversee the day-to-day operations, maintenance and management of the casino, personnel management, personnel policies, and employment decisions. Mr. Atwood was hired by Grand Casino. Mr. Atwood's employment continued until July 3, 1997, when Mr. Atwood was terminated. The termination was based on accusations that Mr. Atwood allegedly assisted Mr. Gondron, a patron, in cheating. Both Mr. Atwood and Mr. Gondron were escorted out of the casino and barred from returning.

Prior to that event, when Mr. Gondron gambled, he routinely requested a private black jack table and also Mr. Atwood's expertise as a dealer. During the course of these private games, Mr. Atwood became concerned about the appearance of impropriety, as he had received two gifts from Mr. Gondron (a stuffed animal and a bag of tomatoes). He expressed these concerns to his pit boss and other supervisors. Despite his concerns, he was required to continue dealing to Mr. Gondron. At some point, the Louisiana Gaming Commission began conducting surveillance of these private games. Based on the surveillance, Mr. Atwood was terminated and removed from the casino on July 3, 1997.

The defendants' reasons for termination included violations of Tribal and

Grand Casino's policies and procedures, as well as card marking and inappropriate behavior with a patron. Mr. Atwood requested the defendants supply him with the basis for his termination. On his request, Thomas Michael Jones composed a letter that contained the allegations and sent it to Mr. Atwood and his attorney. There is some dispute concerning whether this letter, once composed, was approved by the commission. The letter was subsequently distributed to the members of the commission.

These allegations were also communicated to those outside of this casino. An employee of the casino told Lawrence Beale, the Casino's Director of Surveillance, about Mr. Atwood's termination. Lawrence Beale then communicated some form of that information to Robert Thursby, the Director of Table Games at the Isle of Capri Casino.

Since Mr. Atwood's termination, he has not worked as a dealer. He has sued for damages for defamation and intentional infliction of emotional distress.

**PROCEDURAL FACTS**

Mr. Atwood sued Grand Casino, Trooper Ivey, the Louisiana State Police, Mr. Jones and Mr. Beale. The Louisiana State Police and Trooper Ivey were dismissed on October 7, 1999. On January 10, 2003, the remaining defendants filed a motion for summary judgment. The trial court granted a partial summary judgment for the defendants against Mr. Gondron but reserved Mr. Atwood's rights. On October 10, 2003, the court heard arguments concerning the motion for summary judgment. The judge issued a ruling on the motion on December 12, 2003. On January 16, 2004, the plaintiff requested leave of court to file a devolutive appeal from the December 12,

2

2003 ruling. On May 13, 2004, the judgment granting the defendant's motion for summary judgment was signed. Leave was granted and plaintiff was given until June 21, 2004 to file the appeal, which he timely filed.

**ASSIGNMENTS OF ERROR**

> Whether the trial court erred in granting the motion for summary judgment filed on behalf of the defendants and dismissing the appellant's action?

**LAW AND ANALYSIS**

The proper standard of review for an appellate court considering summary judgment is de novo. "Appellate courts review summary judgments *de novo*. It is well established that a summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law." *Palma, Inc., v. Crane Servs. Inc.*, 03-0614, p. 3 (La.App. 3 Cir. 11/5/03), 858 So.2d 772, 774 (citations omitted). The Louisiana Supreme Court has provided guidance in determining when a fact is material.

> A fact is "material" when its existence or nonexistence may be essential to plaintiff's cause of action under the applicable theory of recovery. "[F]acts are material if they potentially insure or preclude recovery, affect a litigant's ultimate success, or determine the outcome of the legal dispute." Simply put, a "material" fact is one that would matter on the trial on the merits. Any doubt as to a dispute regarding a material issue of fact must be resolved against granting the motion and in favor of a trial on the merits.

*Davis v. M & E Food Mart, Inc., No. 2,* 02-0585, p. 4 (La.App. 3 Cir. 10/30/02), 829 So.2d 1194, 1198 citing *Smith v. Our Lady of the Lake Hosp., Inc.,* 93-2512 (La. 7/5/94), 639 So.2d 730, 751.

**DISCUSSION**

The plaintiff/appellant, Mr. Atwood, has brought a defamation suit against the defendants. In a defamation suit, there are several elements that must be proven.

> Defamation is an invasion of a person's interest in his reputation and good name. *Sassone v. Elder,* 626 So.2d 345, 350 (La.1993), citing W. Page Keeton, et al., Prosser and Keeton on the Law of Torts Sec. 111 (5th ed.1984) The essential elements of a defamation action are (1) defamatory words, (2) publication or communication to a third person, (3) falsity, (4) malice (actual or implied) and (5) resulting injury. *Brannan v. Wyeth Laboratories, Inc.,* 526 So.2d 1101, 1105 (La. 1988); *Cangelosi v. Schwegmann Bros. Giant SuperMarkets,* 390 So.2d 196 (La.1980).

*Huxen v. Villasenor,* 01-288 (La.App. 5 Cir. 9/25/01), 798 So.2d 209, 212.

The first requirement is that the words must be defamatory. What are defamatory words?

> Defamatory words are, by definition, words which tend to harm the reputation of another so as to lower the person in the estimation of the community, to deter others from associating or dealing with the person, or otherwise expose a person to contempt or ridicule. Words which convey an element of personal disgrace, dishonesty, or disrepute are defamatory.

*Costello v. Hardy,* 03-1146, p. 22-23 (La. 1/21/04), 864 So.2d 129 (citations omitted.)

Were the statements in question defamatory? There are two specific allegations of defamation; (1) the letter Mr. Jones prepared and circulated to the commission, and (2) Mr. Beale's statement to Mr. Thursby.

**A.    Mr. Jones' letter**

Following Mr. Atwood's removal and termination from the casino, he requested a list of specific allegations against him. Upon his request, Mr. Jones, Chief Investigator for the Tribal Gaming Commission, was instructed to prepare these allegations. The letter in question contained the following allegations:

4

1. Violated Tribal - State Compact Section 7(C)(1)(u): Has created or fostered appearance of impropriety, by virtue of their present or past activities, criminal record, reputation, habits, or associations, or has otherwise engendered a situation which threatens the public interest in the integrity of gaming, the effectiveness of gaming regulation and control, or in fair and lawful practices, methods and financial arrangements in gaming.

2. Violated Tribal - State Compact Section 10(A): All Class III gaming shall be conducted in such a manner, that ensure to the maximum extent practicable, that it is secure, honest, and that the interests of the Coushatta Tribe of Louisiana, the State of Louisiana, and the public are protected at all times.

3. Violated Grand Casinos, Inc., Policy and Procedures No. 23,010 entitled, "Conflict of Interest/Business Ethics" Part III-A: Associates are expected to represent the Company in a positive and ethical manner while on or off duty and have an obligation both to avoid conflicts of interest and to refer questions and concerns about potential conflicts to their supervisor.

4. Violated Grand Casinos, Inc. Standard Procedure Manual, Table Games Dealer Manual - General: Paragraph 9. A dealer may not deal to close friends or relatives.

   \* \* \* \* \* \* \* \* \*

   After Mr. Gondron and Mr. Atwood was finished gaming, the shoe was pulled from the table by Inspectors and given to the La. State Police for analysis. **The cards were found to be marked on all of the high denomination cards.**

Based on the definition of defamatory, the last statement, without more, appears to be defamatory and is the basis of the Mr. Atwood's argument.

The next requirement for a defamation suit is publication, which is the primary issue of this case. "Publication refers to any nonprivileged communication of defamatory words, written or oral, and it renders a defendant liable 'for all republication that is the natural and probable consequence of the author's act.'" *Doe v. Grant,* 01-0175, p. 8 (La.App. 4 Cir. 1/29/03), 839 So.2d 408, 416, *writ denied,* 03-0604 (La. 5/2/03), 842 So.2d 1102. This letter, prepared by Mr. Jones, was

5

subsequently distributed to members of the commission. The plaintiff contends that Mr. Jones' circulation of this letter to the members of the commission is publication, and therefore, not protected by the defense of privilege. The defendant argues that it is not considered publication if circulated only within the ranks of management.

> An intra-corporate communication, among officers or agents of the same corporation, and in relation to their duties for the corporation, is merely a communication of the corporation itself. It cannot be construed as being a communication to a third party. This position is supported by *Cangelosi v. Schwegmann Brothers Giant Super Markets,* 390 So.2d 196 (La. 1980), in which the Supreme Court found that statements made by and in the presence of other supervisory personnel, to an employee concerning an altered check, did not constitute publication, since the supervisory personnel were essential to the investigation. We interpret this case to mean that statements between employees, made within the course and scope of their employment, are not statements communicated or publicized to third persons.

*Commercial Union Life Ins. Co., v. Melikyan,* 424 So.2d 1114, 1115, (La.App. 1 Cir. 1982).

However, *Commercial Union* must be received in conjunction with the case of *Heflin,* which requires an additional element of good faith. "An employer's communication regarding a subject in which it has an interest or a duty is not considered published when made in good faith." *Heflin v. Sabine Ass'n of Retarded Citizens,* 96-782 (La.App. 3 Cir. 12/26/96), 685 So.2d 665, 667. ". . .[G]ood faith means having reasonable grounds for believing that the statement is true." *Melancon v. Hyatt Corp.,* 589 So.2d 1186, 1189 (La.App. 4 Cir. 1991), *writ denied,* 592 So.2d 411 (La.1992). The question then arises, was Mr. Jones in good faith when he circulated the letter to the members of the commission containing these allegations?

Analyzing the facts, the incident occurred on July 3, 1997 and either on that day or shortly thereafter, but prior to the hearing, Mr. Jones met with Trooper Ivey

6

and discussed whether or not the cards had in fact been marked.  Both were unsure whether the cards were marked as evidenced in the deposition of Mr. Jones and the deposition of Trooper Ivey.

Trooper Ivey's deposition states:

> Q      Did you conclude that this was a marked deck?
> A      No, sir.  I told them that, you know, the percentage - - just looking at it, it was peculiar that there was a larger percentage of ten, you know, nine, ten, face cards that had indentions rather than ones that didn't, and told them that we needed to look into it further, that they may want to get one of their people that's you know, from Vegas or Atlantic City that they had here - - Mike Frawley was the VP of Table Games.  I said he's worked in Atlantic City.  So we need somebody that's an expert, you know, to look at them, I said, because I can't - - **This isn't what I was trained to see as marked cards. . . .**
> Q      Did you at any time say to any of the people present here that you found or determined these cards to be marked?
> A      No, sir.
> (Emphasis added.)

As clearly indicated by Trooper Ivey's deposition, he was not an expert in examining cards and he did not say that the cards were marked.  During Mr. Jones deposition, when questioned concerning the conversation he had with Trooper Ivey, Mr. Jones states, that Trooper Ivey did **not** tell him the cards were marked.

> Q      All right.  And what do you recall about the substance of that discussion about the cards?
> A      Basically, that he was no expert, but it appeared to be that a lot of high denomination cards had been crimped somehow, like a little bit of a dent put on it.
> *     *     *     *     *     *     *     *     ***
> Q      Did he show you what he was taking to be a dent in the cards?
> A      He showed me what he - - looked like a - - or showed me what it looked like.
> Q      **Did he tell you that that consisted or was marking of the cards?**
> A      **No.  He said it appeared to be a crimp on the cards.  He**

7

> **never said marked, and he definitely didn't say he was an expert, so I didn't - - just taking his - - what he saw.**

Q    Did he also show you any other cards other than high denomination cards that appeared to be - -

A    We looked at - - I guess - - we didn't look at all the cards, but there were a few small cards that were crimped that I did look at.

Q    And were there also some large or high denomination - - by high I mean either face cards, tens or aces - -

A    That's what I mean by high denomination cards, tens and above.

Q    Now, were there any ten or above cards that did not appear to have a crimp on them?

A    Not all of them are crimped. It didn't look like it.

(Emphasis Added)

There is no indication if this discussion with Trooper Ivey occurred prior to the creation of the letter containing the allegations, but it was prior to the hearing of August 19, 1997. However, even at that hearing, Mr. Jones own statements as to whether the cards were marked is unclear.

A    I just said that the cards were found to be marked on all the high-denomination cards, which might be a mistaken wordage for me, I guess.

Q    Is it true or is it not true?

A    We'd have to look at all the deck and look at them.

Q    All right.

A    **But I would say most right now of the cards, or most of the high denomination cards were marked, and this was told to us by the state police and we looked at - - they showed us the cards.**

Q    **And who - - who made that determination that these cards were marked?**

A    **They did not say they were, you know, words, "They are marked." It appears to be marked, and that was the State Police Sergeant Chris Ivey.**
     (Emphasis Added)

Mr. Jones made three separate statements all indicating different things. In the letter, he stated that all of the high cards were marked. Later at the hearing, he corrected himself and stated that most of the high cards were marked and that he was told this

by the State Police. In the deposition, he stated that some but not all of the high cards were crimped, and that even some low cards were crimped, and that Trooper Ivey did not tell him the cards were marked.

Clearly, Mr. Jones' good faith is in question. At three different times, he has communicated three different tales. Due to the discrepancies in the statements, the question of whether Mr. Jones was in good faith or not remains a material issue of genuine fact which should be determined by the trial court.

Therefore, finding that there exists a definite question as to Mr. Jones' good faith concerning the distribution of the letter to the commission, we find a material issue of fact which requires the trial court's adjudication of the matter, as summary judgment was not appropriate.

**B.     Mr. Beale's statement to Mr. Thursby**

The trial court determined that Mr. Beale's alleged defamatory statements were excused by the defense of truth. The plaintiff challenges the trial court's finding in this regard. The trial court stated, "[t]he court again finds that the alleged defamatory statements of Robert Beale to Robert Thursby were the truth and therefore the truth is an absolute defense to an action of defamation." The court considered statements made during the course of Mr. Beale's deposition. The court took note of Mr. Beale's candid admission that he relayed the information to Mr. Thursby and the court stated, "[b]ased on the depositions and other related evidence, the court finds that it is the truth that there had been an alleged incident between a dealer and a guest and the Commission had 86'd Mr. Gondron and had fired Mr. Atwood. As stated in the court's ruling in the Gondron opinion, truth is an absolute defense to an action of

9

defamation." The deposition of Robert Beale clearly evidences the fact that Mr.

Beale did in fact share this information with Mr. Thursby, but the question remains

as to **exactly** what he shared with Mr. Thursby.

Q      Tell me how you first became aware of these two individuals.

A      I took over the Surveillance Department in August of '97, and the supervisors that were working or the acting manager of the Department, Mike Brown, had told me that there was - - had been an alleged incident between a dealer and a guest.

Q      Now, what did he tell you had happened?

A      <u>From what I recall, he just said it was a dealer-agent thing, and that the Commission had 86'd Mr. Gondron and had fired Mr. Atwood.</u>  (Emphasis Added)

Q      Tell me what a dealer-agent thing is.

                *    *    *    *    *    *    *    *

A      <u>Where a dealer gives the player unfair advantage over the house.  They give a little help.</u>  (Emphasis Added)

                *    *    *    *    *    *    *    *

Q      Now, during September or October of 1997 or after your conversation with Mike Brown, did you relate that information to anyone else?

A      Yes, sir.

Q      To whom?

A      It would have been Bob Thursby

                *    *    *    *    *    *    *    *

A      Bob Thursby is the director of Table Games at the Isle of Capri.

                *    *    *    *    *    *    *    *

Q      And how did that occur; how did that come about?

A      Mr. Thursby and I are acquaintances.  We're friends. We've been friends for some years.  He works at the Isle of Capri and I work up here, and we occasionally talk.

Q      And you exchange information concerning known mechanics and undesirables?

A.      Occasionally, we do, you know, if we see that it - -

Q      Is it customary for casinos to share that type of information with one another?

A      Yes, sir

From the deposition, it is clear that Mr. Beale did in fact communicate some

form of this information to Mr. Thursby.  However, what is unclear is exactly what

information was conveyed. Mr. Beale learned more than that an "alleged incident between a dealer and a guest" had occurred as evidenced by the deposition. He knew the parties involved and that it was a "dealer-agent thing." When asked to define a dealer agent thing, he unequivocally characterized it in a way so as to suggest cheating. He defined a dealer agent thing as "where a dealer gives the player unfair advantage over the house. They give a little help." Considering that Mr. Thursby is the director of table games, if Mr. Beale merely stated that there had been a "dealer-agent thing," Mr. Thursby, would at least arguably, suspect someone was cheating because this would be language he clearly understood based on his position.

The trial court committed an error when they dismissed this case on a motion for summary judgment stating that Mr. Beale's statement to Mr. Thursby was truthful when a genuine issue of material fact exists as to exactly what Mr. Beale told Mr. Thursby. Mr. Beale's statement is susceptible of multiple interpretations and therefore remains a genuine issue of material fact which must be decided before it's truthfulness can be weighed.

## C. Intentional Infliction of Emotional Distress

In oral arguments Mr. Atwood raised the issue of intentional infliction of emotional distress. However, this issue was not raised in the brief as an assignment of error, and therefore, the issue is not before us today. As we are remanding this case, the issue remains alive and the plaintiff may argue it at the trial court level.

## D. Other Arguments

The defendants argue in brief that Grand Casino should be dismissed from the suit as there are no allegations of liability against it and that Mr. Beale and Mr. Jones

are not employed by them, but rather that the interested party is the Coushatta Tribe of Louisiana. Although the issue was argued, it is not an assignment of error. However, we note that formerly this court considered the same issue in a peremptory exception for nonjoinder of an indispensable party and considered all of the defendant's arguments. In that matter, just as in this one, the defendants argued "that the Tribe, as 'employer of all relevant actors, has a significant interest in the outcome of this suit.'" *Atwood v. Grand Casinos of La., Inc.,* 01-1425 (La.App. 3 Cir. 6/5/02), 819 So.2d 440, *writ denied,* 02-1873 (La. 10/14/02), 827 So.2d 426. Therefore, as this court has previously decided this issue, we will not revisit it today.

**CONCLUSION**

Based on this court's determination that genuine issues of material fact exists, we reverse the trial court's grant of a motion for summary judgment and remand for further adjudication. Costs of this appeal are assessed to the defendants.

**REVERSED AND REMANDED.**