731 So.2d 983 (1999)
Henry D. FAIRBANKS
v.
TULANE UNIVERSITY, et al., Board of Trustees for Tulane University and The Administrators of the Tulane Educational Fund.
No. 98-CA-1228.
Court of Appeal of Louisiana, Fourth Circuit.
March 31, 1999.
*984 George L. Bilbe, New Orleans, Louisiana, Counsel for Plaintiff/Appellant.
Benjamin R. Slater, III, Mark E. Van Horn, Cory R. Cahn, Slater Law Firm, New Orleans, Louisiana, Counsel for Defendant/Appellee The Administrators of the Tulane Educational Fund.
Court composed of Judge JOAN BERNARD ARMSTRONG, Judge MOON LANDRIEU, and Judge JAMES F. McKAY, III.
LANDRIEU, Judge.
The plaintiff, Henry Fairbanks, appeals the district court's summary judgment in favor of the defendants, collectively referred to as Tulane. We reverse the district court's judgment.
The plaintiffs father, Professor Fairbanks, was employed by Tulane at the medical school as a faculty member from 1958 until his death in December of 1986, at which time he was a tenured associate professor. At the time of his father's death, the plaintiff was enrolled at Tulane as an undergraduate student and was receiving tuition waivers as the son of a faculty member in accordance with Tulane's policy set forth in the 1986 Faculty Handbook. The plaintiff graduated in the spring of 1994, having obtained tuition waivers through graduation. During the summer of 1994, he obtained a tuition waiver for another undergraduate course. He also enrolled in the business school's M.B.A. program and took a graduate-level course that summer. In August of 1994, he was informed that he would not be granted a tuition waiver for either the summer graduate-level course or the M.B.A. program that fall. Tulane's stated reason was that the 1986 Faculty Handbook had been amended in November of 1992 to disallow tuition waivers for students enrolled in graduate programs. Eventually, the plaintiff obtained his M.B.A. in 1996 after paying over $40,000.00 in tuition and fees to Tulane.
In his suit against Tulane, the plaintiff seeks reimbursement of the tuition paid for his graduate schooling. He asserts (1) his father was reasonable in regarding Tulane to have made a legally enforceable commitment to pay for his children's tuition in the event of his death; (2) his father reasonably relied upon Tulane's promise of tuition waivers while working for a modest salary and in the event of his death; and (3) the plaintiff himself relied upon Tulane's promise of tuition waivers in pursuing his studies at Tulane after his father's death.
*985 Tulane, however, successfully moved for summary judgment on the grounds that the 1986 Faculty Handbook did not confer enforceable rights upon faculty members and that the tuition waivers were unenforceable gratuities. The trial court reasoned that the tuition waivers were a benefit offered by Tulane and that Tulane had a right to change its policy at any time. The court concluded that the benefit did not rise to the level of a contract.
After adequate discovery or after a case is set for trial, a motion that shows there is no genuine issue as to material fact and the mover is entitled to judgment as a matter of law shall be granted. La.Code Civ. Proc. art. 966 C(1). The burden of proof remains with the movant. La.Code Civ. Proc. art. 966 C(2). If the movant will not bear the burden of proof at trial, his burden on the motion does not require him to negate all essential elements of the plaintiff's claim, but rather to point out that there is an absence of factual support for one or more elements essential to the claim. Id. If the plaintiff fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. Id.
When reviewing a grant of summary judgment, the appellate court considers the evidence de novo, using the same criteria applied by the trial court to determine whether summary judgment is appropriate. Smith v. Our Lady of the Lake Hosp., Inc., 93-2512 (La.7/5/94), 639 So.2d 730. Furthermore, all evidence and inferences drawn from the evidence must be construed in the light most favorable to the party opposing the motion; all allegations of the party opposing the motion must be taken as true and all doubt must be resolved in his favor. Schroeder v. Board of Supervisors, 591 So.2d 342, 345 (La.1991).
After reviewing the matter de novo, we conclude the district court erred in granting the defendants' motion for summary judgment. The defendants have not carried their burden of proving that there are no genuine issues of material fact and that they are entitled to summary judgment as a matter of law. See La.Code Civ. Proc. art. 966.
The plaintiff claims that the tuition waiver provision of the 1986 Faculty Handbook created a contractual obligation pursuant to which Tulane was required to waive tuition for his graduate schooling at Tulane. Thus, to succeed on summary judgment, Tulane had the burden of showing the absence of a contract.
The 1986 Tulane Faculty Handbook, in force at the time of the Professor Fairbanks's death and which continued the policy set forth in the 1979 Handbook, contained a section on "Tuition Waivers." That section provided in pertinent part:
1. Full-time members of the compensated faculty on regular appointment with the rank and title of...associate professor...are entitled to receive exemption from the payment of tuition and the university fee for courses they themselves take and are entitled also to tuition exemptions but not exemption from the university fee for their spouses and dependent children.
* * *
5. Exemption from tuition but not the university fee will be granted to children and spouses of the persons defined in paragraph 1 above whose children or spouses are enrolled in Tulane University at the time of their death or retirement. These children shall continue to receive exemption from tuition regardless of the length of service of the individual. For children and for a spouse not enrolled at the time of death or retirement:
(a) If the period of service of the faculty member has been five years or more, the children and the spouse as a group will be eligible to receive a total number of annual tuition waivers equal to the number of years of service, including *986 the academic year in which death or retirement occurs.
(b) If the period of service of such a faculty member has been less than five years, including the year in which death or retirement occurs, the children and the spouse shall not be eligible for tuition waivers.
* * *
7. Tuition waivers for undergraduate study are treated as non-taxable scholarships but, beginning July 1, 1985, tuition remission for education beyond the undergraduate level is defined by the tax code as income taxable to the faculty member.
A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished. La. Civ.Code art. 1906. Four elements are required for confection of a valid contract: (1) the capacity to contract; (2) mutual consent; (3) a certain object; and (4) lawful cause. Babkow v. Morris Bart, P.L.C., 98 0256 (La.App. 4 Cir. 12/16/98), 726 So.2d 423; see also La. Civ.Code arts. 1918, 1927, 1966, and 1971.
A contract is formed by the consent of the parties established through offer and acceptance. La. Civ.Code art. 1927. Unless otherwise prescribed, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent. Id. There need not be conformity between the manner in which the offer is made and the manner in which the offer is accepted. Id. Future things may be the object of a contract. La. Civ.Code art. 1976. Cause is the reason why a party obligates himself. La. Civ.Code art. 1967. A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Id. A contracting party may stipulate a benefit for a third person. La. Civ.Code art. 1978.
With regard to the first element, no one questions the capacity of Tulane or Professor Fairbanks in 1986 when the Handbook was approved. See La. Civ.Code art. 1918.
As to consent, Tulane asserts the handbook provision was created in the absence of mutual consent because Tulane inserted the provision as a mere gratuity for which Professor Fairbanks did not bargain. However, the deposition of Dr. Eamon Kelly, the President of Tulane University indicates that the University Senate, including faculty members, proposed to the university administration the creation of the tuition waiver provision and the preservation of the provision in the 1986 Handbook. Dr. Kelly also stated that faculty members could "rely" upon the terms set forth in the 1986 Handbook, which he had a duty to enforce.
Additionally, other evidence presented by the plaintiff indicates that his father reasonably relied upon Tulane's promise to exempt tuition fees for the children of faculty members who die while employed as full-time professors. Professor Fingerman, who was a member of the faculty in 1986, provided an affidavit in which he stated that he considered the tuition waiver provision to be an unconditional commitment of the university to faculty members. He further stated that he did not believe at the time that the tuition waiver policy could be changed or altered after the faculty member's death. Also, the plaintiff himself attested to his father's representation that his children would be eligible for exemption from tuition fees for both undergraduate and graduate school under the tuition waiver policy for children of deceased faculty members. According to the plaintiff, Professor Fairbanks also said that he had continued to work at Tulane Medical School primarily because of the tuition waivers. Given this evidence produced by the plaintiff, we cannot conclude that Tulane has met its burden of showing no genuine issue as to the material fact of consent.
*987 Tulane apparently contests the certainty of the object of the contract on two grounds. First, Tulane essentially argues the 1986 Handbook was subject to modification and, as such, the provision did not hold out the promise of certainty beyond the moment of its inclusion in the handbook.[1] To illustrate this lack of certainty, Tulane points out that the tuition waiver provision was substantially changed in 1992. Tulane, notably, does not argue that a future benefit, even if conditional, may not form the object of a contract. The tuition waiver provision set forth in Section 5 of the 1986 Handbook was conditional on the faculty member's death and his employment status and history at the time of his death. Professor Fairbanks died while the provision in the 1986 Handbook was in force. Assuming the 1986 tuition waiver provision was a contractual agreement, Professor Fairbanks had no capacity to modify that agreement in 1992. Therefore, that the policy could be changed with respect to currently-employed and living faculty members does not translate into a finding that the tuition waiver provision was not a certain object of the contract between Tulane and Professor Fairbanks in 1986. There is no dispute that a contract may be modified by a subsequent contractual agreement, assuming the parties agree to do so and have the capacity to do so. At any rate, Tulane has not shown how the tuition waiver provision, if it meets the other criteria of a contract, was not "lawful, possible, and determined or determinable" as to Professor Fairbanks either when the 1986 Handbook was approved or at the time of his death. See La. Civ.Code art. 1971.
Tulane's next assertion of an indeterminable object arises in the context of its contention that, if the provision is a contract, it is not a stipulation pour autrui in favor of the plaintiff. Tulane essentially argues the plaintiff could not have been a third party beneficiary of the contract, and, by extrapolation, tuition waivers on his behalf could not have been a certain object of that contract, because Professor Fairbanks's employment began six years before the plaintiff's birth, some twenty-eight years before the 1986 Handbook came into effect. This argument, which incorrectly assumes that the commencement of the original employment relationship is the subject of this litigation, lacks merit. The plain language of Section 5 of the 1986 tuition waiver provision, in force at the time of Professor Fairbanks's death, means that a person such as the plaintiff is covered. The provision explicitly specifies the children and spouse of the faculty member as a class of third party beneficiaries. A stipulation pour autrui, favored in our law, may be for the benefit of undetermined persons, so long as the third party beneficiaries are determinable on the day on which the agreement is to have effect for their benefit. Andrepont v. Acadia Drilling Co., 255 La. 347, 231 So.2d 347, 352 (1969) (on rehearing) (quoting Planiol, Traité lémentaire de Droit Civil, An English Translation by the Louisiana State Law Institute, vol. 2, part 1, No. 1236 (1959)). Here, the third party beneficiaries were determinable at the time of Professor Fairbanks's death. Accordingly, we conclude Tulane has failed to show that this particular plaintiff's tuition was not a certain object of the tuition waiver provision in effect at the time of his father's death.
Lastly, Tulane does not argue that the causewhether an inducement to continued *988 employment or a mere gratuity was not lawful. Even a gratuitous contract may be enforceable under our Civil Code. See La. Civ.Code art. 1910.
Thus, measuring Tulane's arguments against the Civil Code's criteria for a contract, we hold that Tulane has not met its summary judgment burden of proving the nonexistence of a contract.
Our inquiry, however, does not end there. We next examine the Louisiana jurisprudence upon which Tulane relies for the proposition that an employee handbook can never confer an enforceable property right upon the employee or form the basis of a contractual agreement between the employer and the employee. Those cases do not so hold and are inapposite to the facts before us.
In Schwarz v. Administrators of the Tulane Educational Fund, 97-0222 (La.App. 4 Cir. 9/10/97), 699 So.2d 895, this Court considered whether the university, in denying tenure to a probationary employee, breached a contract of employment as set forth in the Tulane Faculty Handbook. We concluded that there was no proof that a contract promising tenure existed between the employee and the university. The Handbook merely set forth the rules, procedures, and considerations that governed tenure and promotion. We reasoned that the guidelines set forth in the Handbook, absent evidence of a promise or guarantee of tenure from the university, did not amount to a contractual agreement to modify the doctrine of employment at will.
In Mix v. University of New Orleans, 609 So.2d 958 (La.App. 4 Cir.1992), writ denied, 612 So.2d 83 (La.1993), the plaintiff alleged the university failed to follow the provisions of its "Grievance Procedure for Unclassified Personnel" when it terminated him. At issue was whether the plaintiff could show that the Grievance Procedure was part of his employment agreement with the university, thereby creating a contractual exception to the employment at will doctrine. After surveying a number of cases, the court concluded it could find no Louisiana case holding that an employee manual, policy, or grievance procedure created such an exception to the doctrine of employment at will.
In Wall v. Tulane University, 499 So.2d 375 (La.App. 4 Cir.1986), writ denied, 500 So.2d 427 (La.1987), the plaintiff alleged he was damaged by the university's action in revising its tuition waiver policy for staff employees so that fewer courses could be taken tuition free. In reliance on the previous policy, the plaintiff had allegedly foregone more lucrative employment so that he could complete his education at the university. In successfully moving for summary judgment, the university maintained that the plaintiff was an employee at will and that it could terminate his employment or modify the benefits of that employment at any time. This court affirmed the district court's ruling, noting that the plaintiff had presented no evidence in opposition to the motion for summary judgment. The court could find no evidence in the record that the staff handbook had been made a part of the plaintiff's employment agreement with the university or that he had been promised an indefinite continuation of the tuition waiver program.
The Wall case, though it concerns tuition waivers, was framed in the context of the "employment at will" doctrine. Tulane's response to Wall's allegations was that he was an employee at will and "that under [La. Civ.Code art. 2747] Tulane was free to terminate his employment or modify the benefits of that employment at anytime." 499 So.2d at 375. Wall was employed by the university at the time the tuition waiver policy was changed; consequently, he was free to accept the changes, to negotiate a return to the previous policy, or to resign from employment.
Here, the plaintiff makes no challenge to Tulane's authority to modify at any time the tuition waiver program set forth in the faculty handbook vis-à-vis currently-employed *989 and living faculty members. The issue is whether the tuition waiver program could be modified with respect to a deceased faculty member's children or spouse after the faculty member had died. The plaintiff makes a reasonable claim that the 1986 Faculty Handbook sets forth a benefit in favor of the deceased faculty member's children or spouse. As discussed below, when the faculty member dies, the children and spouse arguably acquire a property interest in the tuition waiver program as contemplated by the Handbook at the time of the faculty member's death. There is no dispute that the Handbook in force at the time of the plaintiff's father's death provided for continued exemption from tuition fees for both undergraduate and graduate level courses.
Similarly, Mix and Schwarz examined alleged contractual modifications to the "employment at will" doctrine. In each case, the employee was terminated at will, allegedly in violation of a grievance procedure. In Mix, we referred to our decision in Wall, applying it to the facts of Mix's termination. We stated that the Tulane Staff Handbook was not a contract of employment, and indeed, when it comes to providing for continued employment, it was not a contract of employment. We also quoted our observation in Wall that the handbook did not constitute a binding promise to continue the benefits described therein indefinitely. However, we gave no opinion on the enforceability of a provision that expressly anticipated an employee's death and specifically provided benefits for his children well into the future. Further, in Schwarz we held that the plaintiff had failed to prove the existence of a contract between Tulane and Schwarz promising tenure. We did not hold that a provision of the faculty handbook could never become an enforceable obligation.
In sum, Tulane's reliance on this jurisprudence is misplaced. These cases do not assist Tulane in explaining how it could lawfully modify the benefits of Professor Fairbanks's employment after his death or, for that matter, after Professor Fairbanks's son had manifested his intent to avail himself of the benefit stipulated in his favor by the tuition waiver provision.
The plaintiff, in arguing that he acquired a vested property interest in Tulane's tuition waiver program upon his father's death, relies on jurisprudence more relevant to the facts of the instant case. In Knecht v. Board of Trustees for State Colleges and Universities, 591 So.2d 690 (La. 1991), unclassified university employees filed suit to recover for accrued but unused compensatory leave. The employees were salaried personnel hired on an annual basis. Their employment contracts did not originally contain a promise that overtime work would be rewarded with accrued leave time. However, the board of trustees instituted a compensatory leave time policy by executive order. Some five years later, after honoring its obligations to allow employees to earn, accrue, use and retire early on compensatory leave time, the board suspended that policy retroactively.
The Supreme Court held that the employees had a valid and enforceable contract with the board of trustees to receive remuneration for overtime worked and that the institution of the compensatory leave policy was not simply a gratuity that could be modified retroactively. The Supreme Court stated that "when an employer promises a benefit to employees, and employees accept by their actions in meeting the conditions, the result is not a mere gratuity or illusory promise but a vested right in the employee to the promised benefit." 591 So.2d at 695. The Court characterized the compensatory leave time as deferred compensation. The Court observed that under basic contract principles, "once the services are rendered, the right to receive the promised remuneration vests." Id. The Court concluded that the consent of the board of trustees to the contract was implied by holding out the incentive to work overtime without pay, by leading the employees reasonably to expect *990 to receive compensatory leave time, and by putting into place procedures whereby employees earned, accrued, and took paid leave in accordance with the executive order. The Court further reasoned that when the employees worked overtime, thereby accepting the offer of the board of trustees to grant compensatory time off in equivalent hours according to its policy, a binding contract was formed.
In T.L. James & Co., Inc. v. Montgomery, 332 So.2d 834 (La.1975), the Supreme Court held that the contributions by an employer to an employee's retirement and profit-sharing plans are not purely gratuitous; instead, they constitute additional remuneration to the employee who meets the conditions of the plan. The Supreme Court reasoned that the employer's contribution is either a reward for efficient and loyal service or an inducement to remain in the service of the employer. The Court further observed that the employer thus expects and receives consideration for the contribution, while the employee, in complying, earns the reward. The Court concluded that these benefits constitute earned income, i.e., property.
In Morse v. J. Ray McDermott & Co., Inc., 344 So.2d 1353 (La.1976), the Supreme Court again held that an employer's contributions to a profit-sharing plan was in the nature of delayed compensation to the employee for his or her services rendered. The Court reasoned that there was an implicit bargain between the employer and the employee that benefits based upon the additional compensation would be payable to the employee, if, in addition to his past services, he continued his employment with the company for the stipulated period. The Court noted that part of the employer's cause or motive for the contract was to induce the employee, for the benefit of the employer, to continue his employment.
We have also held that an employee handbook may set forth conditions for an employee to acquire a vested property right if the employee satisfies those conditions. In Berteau v. Wiener Corp., 362 So.2d 806 (La.App. 4 Cir.), writ denied, 365 So.2d 242 (La.1978), the plaintiff was terminated for cause. Prior to her termination, however, she had earned and accrued one week of paid vacation, as provided in the employee handbook. The employer denied her request for one week of salary, stating that an unwritten policy precluded payment of any benefit to former employees. This court, noting that vacation benefits are additional wages, held that the employee's right to her vacation had vested under the handbook upon her request for approval. Though this court observed that the handbook could be modified, we refused to permit an unwritten policy to deprive the employee of a vested property right. Furthermore, we stated:
A vested right is defined as that case when "the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. The right must be absolute, complete and unconditional, independent of a contingency, and a mere expectancy of future benefit...does not constitute a vested right."
362 So.2d at 808-09 (quoting Tennant v. Russell, 214 La. 1046, 39 So.2d 726 (1949)).
In the instant case, Tulane in its 1986 Faculty Handbook offered undergraduate and graduate school tuition waivers to the children and spouses of certain faculty members should they die while full-time employees. Once that condition was met, the children and spouse of the deceased faculty member acquired a property interest in the benefit of tuition waivers. Notably, the 1986 Handbook itself distinguishes between children who are enrolled in the university at the time of their parent's death and those who are not.[2] Furthermore, we note the 1986 *991 Handbook envisions that tuition waivers for graduate level courses at least would be considered taxable income to the faculty member. Thus, the tuition waivers, most likely of significant financial benefit to the employee, constituted additional or delayed compensation for the employee's efficient service or his continued service to the university.
For the reasons stated above, we conclude that a genuine issue of material fact remains as to whether there was a contractual agreement between Tulane and Professor Fairbanks providing for undergraduate and graduate school tuition waivers in favor of the plaintiff should his father die while employed as a full-time faculty member. Tulane has not established that it is entitled to summary judgment as a matter of law. Accordingly, we reverse the judgment of the district court and remand the matter to the district court for further proceedings.
REVERSED AND REMANDED.
NOTES
[1] The 1986 Faculty Handbook contained the following passage in the introduction:

This Handbook is intended as a general guide to the policies and operation of Tulane University. For detailed, comprehensive information on the constitutions of the faculties, the regulations of departments, and matters such as benefits, faculty members should refer to the offices of their dean, their department chair and the Personnel Office. The information in the Handbook is current at the date of its issuance, but much of it is presented in summary form and nearly all of it is subject to amendment.
[2] Those who are enrolled may continue to be exempt from tuition fees for an indeterminate period. Children who were not enrolled in the university at the time of their parent's death cannot receive tuition waivers exceeding the number of years the parent was employed. Indeed, non-enrolled children of faculty members with less than five years employment at the time of their death are not entitled to any exemption from tuition fees.