GAIDRY, J.
|2In this employment discrimination and defamation case, the plaintiff appeals a summary judgment granted in favor of the defendants dismissing all of his claims with prejudice. We affirm.
FACTS AND PROCEDURAL HISTORY
Dr. Victor Mbarika, an African-American male, was recruited to work at Louisiana State University (“LSU”) as an Assistant Professor in the Department of Information Systems and Decision Sciences (“ISDS”). Dr. Mbarika’s initial appointment to the position was for a three- *554 year term, from 2001 until 2004. Regarding reappointment after the initial three-year term, his employment contract advised:
Upon expiration of a term appointment, the employee is a free agent to whom the University System has no obligation. The University System may reappoint the employee to the same or a different position. Non-reappointment carries no implication whatsoever as to the quality of the employee’s work, conduct, or professional competence.
Prior to the expiration of his three-year term and after several unfavorable performance evaluations, LSU notified Dr. Mbarika that it did not intend to reappoint him to another three-year term and instead offered him a one-year terminal contract. Dr. Mbarika declined the offer of the one-year terminal contract and left LSU at the end of his initial appointment.
Dr. Mbarika subsequently filed suit against the LSU Board of Supervisors and Dr. Helmut Schneider, Chair of the ISDS Department, alleging that he was discriminated against in the reappointment process based upon his race. Dr. Mbarika also claimed that Dr. Schneider made defamatory statements about him in the reappointment process. Dr. Schneider raised the affirmative defenses of truth and qualified privilege to the defamation claim. The trial court granted summary judgment in favor of |sLSU and Dr. Schneider, dismissing all of Dr. Mbarika’s claims with prejudice, and Dr. Mbarika filed this appeal.
DISCUSSION
When Dr. Mbarika was recruited to work at LSU, he was offered a salary of $88,000.00 per academic year, which was higher than all other assistant and full professors in the ISDS Department. A memo from the Human Resources Department justifying the proposed salary explained that Dr. Mbarika is a minority and there were very few minority candidates in the College of Business and also noted that Dr. Mbarika seemed from his curriculum vitae to be “a very promising candidate.”
At the time he was offered the job, Dr. Mbarika was told that his primary job responsibilities would be “to provide excellence in teaching, to conduct quality research and publish the results thereof in recognized academic journals, and to satisfactorily perform other duties typically associated with the professorate.” He was also informed that while service was important at LSU, it was not expected to be “a major part” of his workload as an un-tenured faculty member. Regarding promotion and tenure, Dr. Mbarika was advised that:
Tenure decisions in the College are based primarily on a faculty member’s teaching and research. Evidence of high quality scholarship and outstanding teaching are crucial for promotion and tenure at LSU. Quality research can be demonstrated by a variety of portfolios, but one crucial indicator to any portfolio would be publication in the leading journals in information systems. Teaching effectiveness is measured in many ways including student evaluations, peer review, and the preparation of your students for upper level classes.[1] (Emphasis added.)
LSU Policy Statement PS-36, entitled “Criteria for Evaluating Academic Performance, and Policy and Procedures on Faculty \ ^Appointment, Performance *555 Evaluation, Reappointment/Non-reappointment, Promotion and Tenure, Appeal Procedures,” provides for performance evaluations conducted annually to “assist the faculty member with [his] future professional development as well as contribute to an understanding of how [his] contribution is viewed by students, colleagues, and the chair.” As part of the annual review process for non-tenured faculty members, the non-tenured faculty member prepares a faculty activity report which outlines his instructional, scholarly, service and other activities over the past year. The tenured faculty in the department then meets to evaluate the performance of the non-tenured faculty member and forwards this evaluation to the department chair, who in turn prepares his assessment of the non-tenured faculty member and submits it, along with the tenured faculty’s evaluation, to both the faculty member and the dean. In the final year of a non-tenured faculty member’s term, these evaluations by the tenured faculty members and the chair also include a recommendation on reappointment.
Dr. Mbarika’s performance evaluations from his years at LSU reveal an inconsistent teaching record, as well as repeated, unsuccessful attempts by the tenured faculty and Dr. Schneider to steer Dr. Mbari-ka in the right direction in his research activities for promotion and tenure purposes.[2]
The May 3, 2002 annual performance review by the ISDS department’s tenured faculty rated Dr. Mbarika’s teaching performance as “about average,” but noted that student evaluations reported Dr. Mbarika’s use of inappropriate and unprofessional language in class and urged him to conduct his classes with decorum and respect for his students in the future. In the area of scholarship, the tenured faculty noted that Dr. Mbarika had | sbeen “very active” and commended him for his enthusiasm and energy; however, they cautioned that:
Junior faculty members in ISDS are encouraged to focus their research efforts on projects that have a high potential for being accepted in the leading journals in information systems, or where appropriate, the leading journals in its reference disciplines. Over time, a strong research portfolio will likely evidence some mix of publications in both first and second tier journals. However, for faculty in the early stages of their careers we suggest targeting the former, with the assumption that the secondary outlets will prove to be acceptable homes for work that does not make it into the first tier outlets. To date, the journals in which Professor Mbarika has published would not be considered among those generally regarded among the first tier.
Professor Mbarika indicates that he has at least six research projects in-progress. We encourage him to closely evaluate these works and to pare this set down to the most promising pieces and focus on preparing those for submission to the leading journals.
The faculty rated Dr. Mbarika’s performance in the area of scholarship as above average in terms of quantity of output, but only average in terms of quality. In summary, the faculty recommended that Dr. Mbarika “focus his efforts in placing the results of his scholarship in more mainstream and widely referenced outlets.”
*556 In Dr. Schneider’s 2002 evaluation, he noted that Dr. Mbarika’s teaching evaluations were at the departmental average. Although he considered Dr. Mbarika to be “without a doubt ... very productive in research,” Dr. Schneider recommended that Dr. Mbarika begin to “target Tier I journals for his research.”
In the tenured faculty’s April 21, 2003 review, they rated Dr. Mbarika’s overall teaching performance as “Very Good.” This assessment was not only based on his student evaluations, which they described as “average,” but also on his development of a new undergraduate level course, presentation of a paper at a teaching workshop, and advisement activities for | kseveral minority student organizations. In the area of scholarship, the faculty commented that Dr. Mbarika had been very active during his second year at LSU, but again cautioned him to “focus [his] research efforts on projects with rigorous methodologies and theories that have a high potential for being accepted in the leading journals in information systems such as MIS Quarterly and Information Systems Research.” They stressed the importance of participating in the department’s Distinguished Speaker Series seminars to learn how the distinguished members and research leaders in the profession develop rigorous methodologies and theories. The faculty again noted that the journals in which Dr. Mbarika published were not considered first tier journals and reminded Dr. Mbarika that a strong research portfolio should have a mix of publications in both first and second tier journals. They again encouraged Dr. Mbarika to closely evaluate the research projects he had in progress, pare them down to the most promising pieces, and focus his efforts on preparing those for submission to the leading journals. The tenured faculty rated Dr. Mbarika’s performance in the scholarship area as “Very Good” in terms of quantity of output, but “Not Very Good” in terms of quality.
Dr. Schneider’s 2003 evaluation of Dr. Mbarika was positive in regards to his teaching and his research efforts; however, Dr. Schneider noted that the faculty was concerned with the rigor of Dr. Mbari-ka’s research because Dr. Mbarika was publishing in journals which were not considered first tier journals. He explained to Dr. Mbarika that a candidate for tenure should have about eight to ten articles comprised of a good mixture of A journals and B journals,[3] and while he had published eleven articles, none of the journals he published in could be considered A journals 17and very few could be considered B journals in the ISDS field. Dr. Schneider encouraged him to “reduce the quantity of research in favor of submitting to Tier I journals ... [and] participate in departmental events such as the speaker series to learn from preeminent researchers about methodologies and techniques in [Information Systems] research.”[4]
The tenured faculty’s April 27, 2004 performance review of Dr. Mbarika included the faculty’s recommendation regarding Dr. Mbarika’s reappointment, as required by PS-36 since his probationary term appointment was scheduled to expire. The faculty rated his overall performance in *557 the area of teaching as “Not Very Good” compared to other professors in the department and college and noted that his student evaluations that year were below average to poor. In the area of scholarship, the faculty again noted that Dr. Mbarika was very active, but that he “continues to hold the mistaken belief that it is quantity rather than quality which matters.” . The evaluation goes on to say that:
None of Professor Mbarika’s publications are in the high quality journals of the IS field even though past faculty evaluations have specifically noted the need to refocus his efforts.
Even well regarded second tier journals such as Information Systems Journal, European Journal of Information Systems, Journal of Information Technology, Information & Management, and Information & Organization, are not among Professor Mbarika’s published outlets even though these journals would appear to be appropriate for his work. Instead, he has chosen to publish in outlets of dubious quality. Thus we are discouraged to see that Professor Mbari-ka appears to have ignored past recommendations .... One might be tempted to think that his work is of insufficient quality to merit publication in high quality outlets and hence the large number of low quality publications.
IsThe faculty is also disappointed in Professor Mbarika [sic] absence at the department’s Distinguished Speaker Series even though it was specifically recommended in last year’s evaluation that he [participate].
The faculty’s overall rating of Dr. Mbari-ka’s performance in the area of scholarship was “Not Very Good.” In making a recommendation regarding Dr. Mbarika’s reappointment to another term, the tenured faculty considered, in addition to his teaching, scholarship, and service, his collegiality and his role in the department. They stated that Dr. Mbarika showed a disregard for behaviors normally associated with being a good colleague; for example, Dr. Mbarika missed classes, regularly came late to class, treated students in a disrespectful and unacceptable manner, and failed to show up to lecture for another professor’s class after agreeing to do so. In addition, he ignored the formal rules and policies of the University and jeopardized the ISDS department by doing so. The faculty believed that his failure to show up when scheduled to speak to other faculty members’ classes, his practice of continuously ignoring the advice of other faculty members, and his display of “very poor judgment” in using the department’s limited resources all proved that Dr. Mbarika had little or no regard for others in the department. The faculty ultimately declined to recommend Dr. Mbarika for reappointment because his “record in scholarship and instruction does not suggest the promise of a successful tenure review ... [n]or is his collegial behavior acceptable.”
Dr. Schneider’s 2004 evaluation of Dr. Mbarika was also not positive. Dr. Schneider rated his performance in teaching as “not very good,” based upon his observations that his student evaluations were below average and that although he mentored many students, he gave incorrect advice to students, creating problems for both the students and the department. In the | narea of scholarship, Dr. Schneider noted that none of the journals in which Dr. Mbarika published were on the ISDS Department’s “Top 20” ranked journals, but a few of his publications were in journals which might be considered “B” journals. Dr. Schneider stated that Dr. Mbar-ika had not changed his research focus since his Last evaluation and was still pursuing quick publications in second and third tier journals. Dr. Schneider went on *558 to express concern about Dr. Mbarika’s disregard for policies and for the suggestions and recommendations of his supervisors. He gave the following examples: Dr. Mbarika spent $600.00 on Federal Express without authorization; he submitted a grant proposal without a routing form; he ignored the MBA Director, Dean, and Chairman’s suggestions regarding attire when teaching MBA classes; he approved a plan of study for a Ph.D. student without chair approval; he misinformed a master’s student regarding thesis requirements; he had an older printer repaired by an outside vendor for $300.00 without approval; he caused the cancellation of the departmental credit card; he fired a graduate assistant without due process; and he submitted papers to journals without the coauthors’ knowledge or approval. Dr. Schneider believed that all of these actions, however minor, pointed to an attitude of disrespect for due process and that his non-cooperative, disruptive, and combative behavior demonstrated a lack of collegiality and significantly interfered with the mission of the department. Finally, Dr. Schneider stated that although Dr. Mbarika was very active in research and advisement of students, he lacked the necessary qualities and professionalism to achieve tenure at LSU, and thus he could not recommend the renewal of his contract.
Dr. Mbarika refused to sign his last evaluation because he alleged that it was “full of hate, blatant personal prejudices,” “gross misrepresentations,” hnand “clear signs of discrimination.” He expounded on his beliefs in a nine-page letter to Dean Robert Sumichrast. In this letter, he explained his side of some of the criticisms of his performance contained in his evaluations and also described how he believed he had been treated unfairly during his time at LSU. Dr. Mbarika made many references in his letter to prejudice and discrimination, and how people of different races are treated at LSU. He referenced the “history of discrimination against African American males in this country” and the “well-known and broadly covered (in Europe) issues related to hatred and racial biases that many, many Germans have against people of African descent.”[5] However, in the conclusion of his letter, Dr. Mbarika states “Again I in NO-WAY claim these actions are racially-based. What the prejudices are based on is something I may never know.”
Although Dr. Mbarika’s letter stated that he did not believe the actions were racially-based, Dean Sumichrast turned the letter over to the Human Resources department for investigation because it clearly insinuated race discrimination. The investigation, which involved interviewing Dr. Mbarika, Dr. Schneider, and other members of the ISDS department, as well as reviewing Dr. Mbarika’s employment records, ultimately resulted in a finding that there was no evidence of discrimination.
Dr. Mbarika later testified at his deposition that he believed he was discriminated against in the reappointment process based on his race because he had more publications at the time he was denied reappointment than the other assistant professors who were white. As an example, Dr. Mbarika stated that a white female assistant professor, Dr. Andrea Houston, received tenure with only six publications, while he had fifteen publications and was not reappointed. Dr. Schneider responded in his own deposition that Dr. h Houston’s situation was different from Dr. Mbarika’s because she responded to the tenured faculty’s sug *559 gestions and made changes. Dean Sumi-chrast explained further that although Dr. Mbarika probably had more publications than other non-tenured faculty members, the other faculty members still had a better publication record than he did. The number of citations made to a particular publication is an indicator of the impact the work is having in the field. Dr. Houston had one very significant article published that had approximately seventy citations, a considerable number according to Dr. Schneider and Dean Sumichrast, which indicates that it is a top-notch publication. Dean Sumichrast testified that, to his recollection, Dr. Mbarika did not have any publications with more than five citations, and some of his work had zero citations, which shows that his work has had little impact on the field.
Dr. Schneider explained further at this deposition why he did not recommend Dr. Mbarika for reappointment. He testified that when evaluating a faculty member, he looks at the faculty member as a whole. In addition to the faculty member’s scholarly, instructional, and service activities, he considers how he interacts with other faculty members, whether he is a “team player,” or whether he constantly creates problems for the department. Dr. Schneider testified that in twenty years he never had another professor do the things that Dr. Mbarika did in his three years at LSU. As an example, Dr. Schneider testified that when Dr. Mbarika taught an MBA class, the director of the MBA program had to speak to Dr. Mbarika about the program’s dress code and ask him to dress more professionally or in business casual attire, and that the next day Dr. Mbarika arrived to teach the class in a football jersey with a baseball cap on backwards. Dr. Schneider found Dr. Mbari-ka’s willful disregard of the ]iaMBA director’s request that he dress up troubling, as well as Dr. Mbarika’s explanation that he did not know that there was a dress code because no one told him. Dr. Schneider testified that every time Dr. Mbarika violated a rule, he claimed ignorance of the rule, but that other faculty members did not seem to have a problem understanding what was expected of them. Dr. Schneider testified that along with the dress code issue, there were student complaints about Dr. Mbarika’s teaching in the MBA class, and that after that initial MBA class, the MBA director told him to “never put [Dr. Mbarika] in another MBA class.” He testified that this sort of behavior made Dr. Mbarika not the type of person you would want in your department.
Dean Sumichrast also stated that he considers the overall record of a candidate when deciding whether to vote for reappointment, i.e., the faculty member’s efforts in teaching, research, and service, combined with his contributions to the college, to LSU, and to the department. To Dean Sumichrast’s understanding, Dr. Mbarika was not reappointed because he:
didn’t meet the expectations of the college and the department. We look for someone who is going to be a contributing member to the college and the department, as well as someone who can build his or her own reputation. We look for someone who will be able to make promotion and tenure at the six-year point. And it is our belief that Dr. Mbarika was not going to ... be successful at the promotion and tenure point.
When asked where Dr. Mbarika was falling short, Dean Sumichrast said “it was a combination.” Dean Sumichrast reviewed Dr. Mbarika’s publications and felt that they weren’t of the rigor and quality that was expected and were not well aligned with the mission of the ISDS Department. Many of his publications were in journals that were oriented towards education, *560 rather than the mainstream of ISDS; few were in top tier journals in ISDS. He went on to say that although Dr. Mbarika applied for and received a small 11sgrant, it too was oriented towards education, rather than towards the mainstream of the ISDS Department. Additionally, because of the concerns about his judgment, Dean Sumi-chrast testified that he would be concerned that Dr. Mbarika would not be a good representative of the ISDS Department on committees at the college or university level or outside of the college at the national or international organization level.
Former Dean Thomas Clark also cited “the level of research project that he was working with” and “[h]is lack of participation in the collegium” as reasons for voting against Dr. Mbarika’s reappointment. Dr. Clark simply did not feel that his research was going to ultimately result in tenure and noted that Dr. Mbarika had repeatedly been given advice about that deficiency. In fact, Dr. Clark testified that he personally offered to help Dr. Mbarika target his research to achieve positive promotion and tenure results, but that Dr. Mbarika failed to follow through and take him up on his offer.
Although Dr. Mbarika complained that Dr. Schneider’s final performance evaluation of his research activities ignored the fact that he had several articles submitted or in the “revise and resubmit” stage in “A” and “B” list journals, Dr. Schneider stated that Dr. Mbarika had ignored the suggestions of the faculty and department chair regarding publication practice during his time at LSU, and then at the end of his third year, he stated in his faculty activity report that he had articles submitted or in the revise and resubmit stage at top journals, without providing any proof such as a letter saying that an article was tentatively accepted. Dr. Schneider explained that at that late date, with nothing offered to back up his assertions, it was simply too late to make a difference in his evaluation. Dean Sumichrast agreed with Dr. Schneider and further explained that work “in the pipeline” is viewed very differently from published work because it | udoes not always result in a publication. Having papers under review in leading journals essentially means nothing because anyone can submit a paper, and even papers in the revise and resubmit stage are not always published.
Dr. Mbarika also made some assertions that the ISDS department changed which journals were ranked “A” and “B” journals and made the journal rankings purposely vague to prevent his publications from being in these lists. However, Dr. Schneider testified that journal rankings change over time and it was part of all faculty members’ jobs to know which journals were the leading journals in their field at the time and to pursue publication in those top journals. A journal’s ranking was tied in part to the rigor of the editorial board’s review process, and a journal which had been a top journal in information systems at one time might no longer be considered a leading journal because of changes in its editorial process. Lists of those journals which were considered the top journals were prepared from time to time and circulated in the department. Additionally, the proposed ranking of journals was often discussed at faculty meetings and retreats, where Dr. Mbarika’s attendance was described as “spotty at best.” According to a December 2003 journal ranking prepared by LSU’s ISDS Department, the list was not exhaustive, however, faculty members publishing in journals not on the list should provide evidence regarding the ranking of the journal in the respective fields. This 2003 list also stated that for promotion and tenure purposes, publication in “A” journals would likely result in positive promotion and tenure recommen *561 dations, while publication in “B” journals would be viewed positively in the promotion and tenure process, but publishing exclusively in “B” journals might not lead to promotion and tenure. Finally, Dr. Mbarika’s annual evaluations reveal that 1 ishe was advised continually of the specific journals he should target in order to achieve success in promotion and tenure reviews.
Summary Judgment
A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine factual dispute. Sanders v. Ashland Oil, Inc., 96-1751, p. 5 (La.App. 1 Cir. 6/20/97), 696 So.2d 1031, 1034, writ denied, 97-1911 (La.10/31/97), 703 So.2d 29. Summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). Summary judgment is favored and “is designed to secure the just, speedy, and inexpensive determination of every action.” La. C.C.P. art. 966(A)(2).
If the mover will not bear the burden of proof at trial, his burden on the motion for summary judgment does not require him to negate all essential elements of the plaintiffs claim, but rather to point out that there is an absence of factual support for one or more elements essential to the claim. See La. C.C.P. art. 966 C(2); Fairbanks v. Tulane University, 98-1228, p. 2 (La.App. 4 Cir.3/31/99), 731 So.2d 983, 985. After the mover has met his initial burden of proof, the burden shifts to the non-moving party to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden at trial. La. C.C.P. art. 966 C(2); See Smith v. General Motors Corp., 31,258, p. 4 (La. App. 2 Cir. 12/9/98), 722 So.2d 348, 350. In so doing, the party opposing summary judgment cannot rest on the mere allegations of his pleadings, but must show that he has evidence which could satisfy his evidentiary burden at trial. If he does not produce such evidence, then there is no genuine issue of material fact and the mover is 11fientitled to summary judgment. See La. C.C.P. art. 966(C)(2); Moody v. Weatherford U.S., 35,882, p. 3 (La.App. 2 Cir. 7/17/02), 821 So.2d 780, 783.
In determining whether summary judgment is appropriate, appellate courts review evidence de novo under the same criteria that govern the trial court’s determination of whether summary judgment is appropriate. Sanders, 96-1751 at p. 7, 696 So.2d at 1035. Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to this case. Walker v. Phi Beta Sigma Fraternity (RHO Chapter), 96-2345, p. 6 (La.App. 1 Cir. 12/29/97), 706 So.2d 525, 528.
Racial Discrimination
Employers may not intentionally refuse to hire, discharge, or otherwise intentionally discriminate against any individual with respect to his compensation or the terms or conditions of employment on the basis of race, color, religion, sex or national origin. La. R.S. 23:332(A)(1). Because the Louisiana and federal anti-discrimination statutes are similar in scope, courts often consider federal jurisprudence when construing state law. See Hicks v. Central Louisiana Electric Co. Inc., 97-1232, p. 3 (La.App. 1 Cir. 5/15/98), 712 So.2d 656, 658.
In order to be actionable under La. R.S. 23:332, the discrimination must be by *562 an “employer” which La. R.S. 23:302 defines as:
a person, association, legal or commercial entity, the state, or any state agency, board, commission, or political subdivision of the state receiving services from an employee and, in return, giving compensation of any kind to an employee ... [and] who employs twenty or more employees within this state for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.
117Pr. Schneider was not Dr. Mbarika’s employer, as that term is defined in La. R.S. 23:302; therefore, summary judgment was appropriate for Dr. Mbarika’s racial discrimination claims against Dr. Schneider.
Regarding Dr. Mbarika’s race discrimination claims against LSU, a pri-ma facie case of employment discrimination includes proof by a preponderance of the evidence that the plaintiff: (1) belongs to a protected group; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was replaced by someone outside of the protected group. See Price v. Fed. Express Corp., 283 F.3d 715, 720 (5th Cir.2002), citing St. Mary’s Honor Ctr. v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If a prima facie case is established, a rebutta-ble presumption is created that the employer unlawfully discriminated against the employee. Price, 283 F.3d at 720. In order to rebut the presumption of discrimination, the defendant must provide a legitimate, non-discriminatory reason for the adverse employment action. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). To avoid summary judgment once the defendant has presented a legitimate, nondiscriminatory reason for its actions, the plaintiff must offer sufficient evidence to create a genuine issue of material fact that the defendant’s proffered reason was pre-textual, or, in a “mixed-motive” case, sufficient evidence to create a genuine issue of material fact that defendant’s reason, while true, is only one of the reasons for its conduct, and the plaintiffs race is another “motivating factor” for the defendant’s conduct. Ward v. Midwestern State University, 217 Fed.Appx. 325, 327, 2007 WL 464693 (C.A.5 (Tex.), 2007).
The defendants claim that Dr. Mbarika cannot set forth a prima facie case of race discrimination because he lacked proof that he was replaced by | lssomeone outside of the group and because he was not qualified for the position because he “did not meet the standards for teaching, publishing and collegiality that would have permitted his reappointment.”
We agree that Dr. Mbarika presented no evidence that he was replaced by someone outside of the protected group. Whether or not he was “qualified” for the position is a more difficult question. However, even assuming that Dr. Mbarika was able to set forth a prima facie case of discrimination, which we do not find, LSU presented a legitimate, non-discriminatory reason for their action; i.e., that Dr. Mbar-ika “did not meet the standards for teaching, publishing and collegiality that would have permitted his reappointment.” The evidence in the record is more than sufficient to justify the action taken by LSU. The tenured faculty and Dr. Schneider spelled out year after year in their evaluations of his performance exactly what actions Dr. Mbarika should take in order to achieve positive promotion and tenure reviews, yet Dr. Mbarika continually failed to follow their advice. Furthermore, Dr. Mbarika presented no evidence to suggest that LSU’s legitimate, non-discriminatory reason was pretext for race discrimination or even that race was a motivating factor. *563 On the contrary, the only evidence regarding race reveals that Dr. Mbarika’s race was considered a positive when he was being recruited, and Dr. Mbarika was commended during his time at LSU for his efforts in recruiting and mentoring minority students. Thus, summary judgment is appropriate on Dr. Mbarika’s race discrimination claim against LSU.
Defamation
Defamation is a tort involving the invasion of a person’s interest in his or her reputation and good name. Costell v. Hardy, 2003-1146, p. 12, (La.1/21/04), 864 So.2d 129, 139. Four elements are necessary to establish a linclaim for defamation: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury. Id., quoting Trentecosta v. Beck, 96-2388, p. 10 (La.10/21/97), 703 So.2d 552, 559; Restatement (Second) of Torts § 558 (1977). The fault requirement is generally referred to in the jurisprudence as malice, actual or implied. Costello, 03-1146 at p. 12, 864 So.2d at 139.
Proof of the truth or substantial truth of a defamatory remark is a valid defense in a civil suit for defamation. La. R.S. 13:3602; Batiste v. Guiteau, 413 So.2d 559, 563 (La.App. 1 Cir.), writ denied, 414 So.2d 776 (La.1982). Privilege is also a defense to a defamation action. Aranyosi v. Delchamps, 98-1325, p. 6 (La.App. 1 Cir. 6/25/99), 739 So.2d 911, 915, writ denied, 99-2199 (La.11/5/99), 750 So.2d 187. Privileged communications are divided into two general classes: (1) absolute or unqualified; and (2) conditional or qualified. An absolute privilege exists in a limited number of situations, such as certain statements by judges and legislators in their official capacities. In a broader number of instances, statements enjoy a conditional privilege. Id., 98-1325 at pp. 6-7, 739 So.2d at 915-16. A conditional privilege is applicable if the communication is made (a) in good faith,[6] (b) on any subject matter in which the person communicating has an interest or in reference to which he has a duty, (c) to a person having a corresponding interest or duty. Id., 98-1325 at p. 7, 739 So.2d at 916. This privilege arises from the social necessity of permitting full and unrestricted communication concerning a matter in which the parties have an interest or duty, without inhibiting free communication in such instances by the fear that the | ^communicating party will be held liable in damages if the good faith communication later turns out to be inaccurate. Id.
Failure to dismiss an unwarranted defamation action by summary judgment produces long and expensive litigation which has a chilling effect upon free speech. See Sassone v. Elder, 626 So.2d 345 (La.1993). Thus, in order to survive a motion for summary judgment, a defamation plaintiff must produce evidence of sufficient quality and quantity to demonstrate that he likely will be able to meet his burden of proof at trial. Without such evidence, there is no genuine issue of material fact, and summary judgment should be granted. La. C.C.P. art. 966.
Dr. Mbarika alleges that Dr. Schneider defamed him by “publishing false and misleading information about Dr. Mbarika that tended to portray him in a false and adverse light, specifically by distorting Dr. Mbarika’s record of publications, teaching, *564 and service to the university community, to other faculty members, specifically those senior faculty members within the Department of Information Systems & Decision Sciences with responsibility for conducting Dr. Mbarika’s evaluations and reappointment and tenure reviews.” When asked at his deposition for specifics on how Dr. Schneider defamed him, Dr. Mbarika gave the following reasons: (1) Dr. Schneider’s final evaluation of Dr. Mbarika did not mention the articles he had in the revise and resubmit stage, the National Science Foundation grant he received, or the fact that he chaired the committee of the first black Ph.D. student in the department; (2) Dr. Schneider falsely claimed that Dr. Mbarika misinformed a Master’s student concerning thesis requirements; (3) Dr. Schneider falsely accused Dr. Mbarika of firing a graduate assistant without due process; (4) Dr. Schneider falsely claimed that Dr. Mbarika submitted a grant proposal without a routing form; (5) Dr. Schneider falsely |g1 claimed that Dr. Mbarika approved a plan of study for a Ph.D. student without chair approval; (6) Dr. Schneider falsely accused Dr. Mbarika of sending a three-year-old printer to an outside vendor for repairs; (7) Dr. Schneider falsely accused Dr. Mbarika of handing out departmental I.D.’s and passwords to students; (8) Dr. Schneider stated that Dr. Mbarika submitted a paper for publication without the co-authors’ knowledge or approval; and (9) Dr. Schneider called Dr. Mbarika “combative.”
The first element of a defamation action is a statement. Thus, the allegations that Dr. Schneider defamed Dr. Mbarika by failing to make a statement about some of his accomplishments[7] cannot support a claim of defamation. Additionally, we note that the procedure for annual performance evaluations involves the non-tenured faculty member first preparing a faculty activity report and submitting it to the tenured faculty members, who then prepare their performance evaluation and send it to the chair so that he may prepare his performance evaluation. Any alleged failure by Dr. Schneider to mention any of Dr. Mbarika’s accomplishments in his final performance evaluation could not have affected the tenured faculty’s evaluation and decision not to recommend reappointment because his recommendation came after theirs.
Dr. Schneider’s statements concerning the firing of a graduate assistant, the printer repairs, the sharing of passwords, and the submission of a paper without the co-authors’ knowledge or consent are all shown by the evidence in the record to be true or at least substantially true. In addition to testimony by others in the department that Dr. Mbarika fired his graduate assistant or directed an administrative assistant to fire her, Dr. Mbarika himself stated clearly and unequivocally several times in his letter to Dean | ^Sumichrast that he fired his graduate assistant. Dr. Mbarika also admitted requesting that the printer be repaired, giving out his password and I.D. to students, and submitting a paper without his coauthors’ consent, but attempted to explain or justify his actions. Despite his arguments that his actions were mischaracter-ized by Dr. Schneider, these statements made by Dr. Schneider were true or substantially true and thus not actionable.
Finally, Dr. Schneider’s good faith assessment of a faculty member’s performance in the annual performance evaluation process is clearly entitled to a conditional privilege. LSU obviously has an interest *565 in making certain that a faculty member is qualified and will be an asset to the university prior to granting tenure. As the chair of the ISDS department, Dr. Schneider has a corresponding duty to make an honest assessment of Dr. Mbarika’s qualifications and his contributions to the department. There are no allegations that Dr. Schneider communicated this information to anyone not a part of the evaluation process. Further, the record does not support that these statements were not made in good faith, ie., without Dr. Schneider having reasonable grounds to believe their truth. The statements were either backed up by documentary evidence or the testimony of other university employees or faculty members, so that even if they ultimately turned out to be false, the statements are entitled to a conditional privilege because Dr. Schneider had a reasonable basis for believing them to be true.
Because Dr. Mbarika failed to produce the requisite evidence to demonstrate that he would likely be able to carry his burden of proof on the defamation claim at trial, summary judgment in favor of Dr. Schneider is appropriate.
|2rPECREE
The judgment of the trial court granting summary judgment in favor of LSU and Dr. Helmut Schneider and dismissing all of Dr. Mbarika’s claims with prejudice is affirmed. Costs of this appeal are assessed to the plaintiff, Victor Mbarika.
AFFIRMED.

. These details about the assistant professor position and the requirements for promotion and tenure were contained in a November 3, 2000 offer letter to Dr. Mbarika from Dr. Helmut Schneider.

. There were no issues related to Dr. Mbari-ka’s service activities in any of the performance evaluations; those rankings were consistently positive and he was commended for his efforts in recruiting and mentoring minority students.

. First and second tier journals are sometimes referred to as "A” and "B" journals.

. At the bottom of this evaluation, there are handwritten comments by Dr. Mbarika stating that he discussed with Dr. Schneider several journals that he felt should be Tier I journals which were not currently considered Tier I journals and that Dr. Schneider told him the journal rankings would be revisited when Rudy Hirschheim, the Department's new chaired professor, came to LSU. Dr. Mbarika also wrote that he would take Dr. Schneider’s advice and target Tier I journals.

. This comment about Germans presumably referenced Dr. Schneider's German heritage.

. "Good faith” means a statement made with reasonable grounds for believing it to be true. Aranyosi, 98-1325, p. 7, 739 So.2d at 916.

. Interestingly, Dr. Mbarika himself did not mention the fact that he chaired the committee of the first black Ph.D. student in the department in his faculty activity report.